Joseph J. PETERSON, Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY, Defendant.

No. 99 Civ. 0847(CM).

United States District Court, S.D. New York.

Dec. 8, 1999.

Mark Scherzer, New York City, for Joseph J. Peterson, plaintiff.

Randi F Knepp, Del Maure, DiGiaimo & Knepper, P.C., A Professional Corporation, New York City, for Continental Casualty Co, defendant.

MEMORANDUM DECISION AND ORDER DENYING CNA'S MOTION FOR SUMMARY JUDGMENT; DENYING PETERSON'S CROSS–MOTION FOR SUMMARY JUDGMENT; AND DENYING PETERSON'S LEAVE TO AMEND COMPLAINT

McMAHON, District Judge.

*Summary*

Peterson filed this action against Continental Casualty Company ("CNA") seeking benefits under Short– and Long–Term disability benefit plans established and maintained by Peterson's former employer, CBS Broadcasting, Inc., under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), and (e)(1). CNA moved for summary judgment on the ground that the Claim Administrator properly denied the Short–Term and Long–Term disability benefits. Plaintiff filed a cross-motion for summary judgment and for leave to add CBS as a defendant on its claim for penalties for failure to provide requested plan documents.

Plaintiff filed his complaint on February 4, 1999. Both Plaintiff and Defendant sought a ruling on the standard of review to be applied by this Court in reviewing the claim determination. On May 7, 1999, I ruled that the claim determination with respect to the Long–Term disability claim would be reviewed under the arbitrary and capricious standard and that discovery on the issue would be limited to the administrative record. I further ruled that the determination of the Short–Term disability claim would be reviewed *de novo*, and that Mr. Peterson was entitled to additional discovery on that claim. The administrative record was made available to Mr. Peterson, but he requested no additional discovery.

For the reasons stated below, Defendant's motion for summary judgment is denied. This court will retain jurisdiction over the case while the Claim Administrator reconsiders Plaintiff's claims for benefits in light of the terms of the plans, which has not yet been done. Plaintiff's leave to amend the complaint to join CBS as a defendant is denied.

*Facts of the Case*

The following are the facts of the case, viewing the evidence in the light most favorable to the Plaintiff:

Plaintiff Peterson was employed by CBS for approximately 37 years. In 1992, Mr. Peterson was appointed as Associate Director, News Operations, CBS Operations and Engineering. He worked as a production manager, traveling to remote locations for special events such as golf tournaments, the Olympic Games and the Presidential Inauguration.

In mid–1996, CBS assigned him to be the Venue Production Manager for the 1998 Winter Olympics Unit. His duties in the job were varied and frequently unpredictable. The job as structured at the time Peterson took it required such activities as: designing and arranging building, office and temporary site spaces; placing and rearranging office furniture and sup-plies; arranging for and/or handing sanitation requirements; maintaining and supplying safety gear and medical supplies; loading and unloading trucks; operating cars, trucks and forklifts; and maintaining, delivering and using weather-related gear and supplies, such as snow shovels and bags of salt. He and the staff he supervised were responsible for warehousing, moving and using the physical plant supplies required to support a CBS broadcast from a remote location. Physical activity took up approximately 50 percent of his time on the job. Another CBS Venue Production Manager estimated that 30 percent of her time was taken up with strenuous physical activity.

Peterson's job as originally assigned also required extensive travel and on-site activities. During the first 38 payroll weeks of 1997, Peterson worked out of New York for 51 days–26 percent of his payroll hours.

*The Disability*

In September 1997, while he was working in Nagano, Japan, site of the 1998 Winter Olympics, Peterson began suffering acute pain—described as both numbing and tingling—from his elbows to the fingertips of both arms. (Weber Aff. at 10). A local doctor recommended that he return to the United States for treatment, and he did so. Peterson consulted several neurologists and underwent MRI analysis, CT scans and nerve conduction studies. The doctors who examined him found, *inter alia*, that he suffered from back problems. (Lavyne Letter, Oct. 1, 1997, R.161). On November 5, 1997, he visited Dr. Frank Petito, who recommended that Peterson not travel. An MRI performed on February 17, 1998 revealed that Peterson's condition had progressed since September 1997 to include spinal cord compression, resulting from "degeneration of disc material," "mild cord impingement," and "foraminal narrowing." (Sept. 15, 1998 Appeal Letter, R.77 (quoting MRI report)). An independent physician who reviewed the MRI results also concluded

that Peterson suffered from "compression of cervical nerve roots."

Peterson was also diagnosed with severe bilateral carpal tunnel syndrome, for which he underwent surgery on his right hand in November 14, 1997. On March 9, 1998, Peterson had similar surgery on his left hand. Surgery was successful in reducing the pain and tingling in his right arm, but the pain in his left arm persisted and made it difficult for him to use his hand. (Letter of Dr. Petito, August 5, 1998; Letter of Dr. Barrett, September 10, 1998.) In addition, one doctor noted that it was difficult for Peterson to lift anything over fifteen pounds.

During the period from September 1997 through mid–May 1998, CBS assigned Peterson to a desk job in New York. His duties did not include travel to or from venues or any strenuous physical labor. CBS named a replacement to perform Peterson's duties in Nagano. (Cplt. at ¶ 14). In this "standby position," Peterson remained available to assist his replacement over the telephone. According to Peterson's own affidavit, uncontradicted by CBS, Peterson answered the phone, performed "make work" and was given virtually no substantive responsibilities. (Exh. A of Peterson Aff.)

In mid–May 1998—after the Olympics had ended and two months after his second surgery had failed to alleviate all his symptoms—Peterson concluded that he would be physically unable to resume his old duties. He applied for disability benefits at that point.

*The Short– and Long–Term Disability Plans*

During the period Peterson was employed by CBS, he was covered under Short–Term and Long–Term disability plans established and maintained by CBS. CBS was self-insured with respect to Short–Term disability coverage. The group Long–Term disability plan was funded, in whole or in part, through a policy of group Long–Term disability in-

come funded by Continental. The Short–Term and Long–Term benefits are intended to protect employees from loss in the event of disabling injury or illness. The terms of the Short–Term disability plan entitled employees with over ten years of service to 13 weeks of benefits at 100 percent of salary. In order to receive the full amount of the entitlement under the Short–Term plan, the employee is required to provide proof to the Claim Administrator of his total disability.

"Total Disability" is defined in the Short–Term Disability Plan as follows:

> "Total Disability" or "Totally Disabled" means that during the Elimination Period and while the employee is receiving benefits under the program, the Eligible Employee, because of Injury or Sickness, is:
>
> (1) continuously unable to perform the *substantial and material duties of his or her own occupation* due to Injury or Sickness. Total Disability must begin while the employee is covered under the program.
>
> (2) under the regular care of a licensed physician other than the Eligible Employee; *and*
>
> (3) not gainfully employed in any occupation for which the Insured Employee is or becomes qualified, by education, training or experience. Weber Aff. Para 8. (Emphasis added)

An employee is entitled to coverage under the Long–Term plan upon providing proof of a continual total loss of ability to carry out his job. In the Group Long–Term Disability Insurance Plan, "Total Disability" is defined as follows:

> "Total Disability" means that, during the Elimination Period and Your Occupation Period [defined in the schedule as 24 months] shown in the Schedule of Benefits, You, because of Injury or Sickness, are:

(1) continuously unable to perform *the substantial and material duties of Your regular occupation;*

(2) under the regular care of a licensed physician other than yourself; *and*

(3) not gainfully employed in any occupation for which You are or become qualified by education, training or experience. (Weber Aff. ¶ 12 and Exhibit B) (emphasis added).

The policy further provides that:

After the Monthly Benefit has been payable for Your Occupation Period, "Total Disability" means that, because of Injury or Sickness, You are:

(1) continuously unable to engage in *any occupation for which You are or become qualified by education, training or experience;* and

(2) under the regular care of a licensed physician other than Yourself. Weber Affd., para 12 and Exhibit B (emphasis added).

The Plan Administrator for the Long–Term Plan was designated as CBS Broadcasting, Inc. Weber Aff. at 7.

*The Claim*

Peterson telephoned CNA on May 21, 1998 to inform them that he had been totally disabled as of May 18, 1998. Peterson received Short–Term disability benefits from May 21 through July 10, 1998, while his claim was being evaluated. (Weber Aff. at 7). On June 1, 1998, Peterson completed a signed and sworn claim form in which he stated that the he had been unable to perform the duties of his job beginning around September 20, 1997. He wrote "various" in the space designated for "occupation." Dr. Petito completed the Doctor's Statement portion of the form, and listed as his diagnosis: "cervical radiculopathy; bilateral carpal tunnel syndrome and osteophyte, C3–C4 level." The Employer's Statement portion of the claim form was left blank. *See Id.* at 8.

The CNA asked CBS to provide an Employer's Job Activity Statement concerning the material duties of Peterson's occupation. John F. Toohey, Associate Director, Olympic Administration (a division of CBS Sports Asia) completed the form on July 14, 1998. CBS gave Peterson's job title as "Venue Production Manager." Toohey described Peterson's job activities as involving "general office work." He stated that Peterson worked eight hours a day, forty days a week; that his job required no twisting or climbing; that on a typical day he was required to sit seven out of eight hours and be on his feet for one hour; and that no walking, bending, squatting or crawling was required. According to Toohey, the only lifting Peterson was required to do was lifting a telephone or laptop. (Weber Aff. at 12 and Exh. B). In sum, Toohey described Peterson's job as consisting solely of office work and completely sedentary in nature. Aside from the notation "general office work," Toohey did not describe any of the duties and responsibilities of Peterson's position.

Based on this job description, the Claim Administrator at CNA determined that Peterson was not eligible for benefits beyond July 10, 1998 under the terms of the Short–Term Disability Plan. The Claim Administrator determined that no proof substantiated Peterson's claim that he was continuously unable to perform the substantial and material duties of the occupation described by Toohey. Because Peterson was not eligible for short-term benefits, he was denied benefits under the Long–Term Plan as well. Peterson was notified of this decision on July 30, 1998.

In August, Peterson retained counsel, who requested "all records, reports, and opinions ... specifically including any medical opinions, job description, vocational reference manuals and criteria for evaluating disability claims arising from spinal conditions relied upon by CNA thus far to support its denial of benefits." (Weber Aff. at 14). CNA complied with this request. It also informed Peterson's counsel of the procedure for appealing the Administrator's claim denial.

As part of his appeal, Peterson informed CNA that the Job Activity Statement provided by Toohey was incorrect. He asked that a new statement be completed by Darcy Antonellis, a former Vice President of Operations at CBS, who at that time was working for Time Warner. He also provided a letter from Sharon Drankoski, a colleague from CBS who had spent twelve years as a production manager. She described the production manager job as requiring significant physical activity.

CNA declined to seek information concerning Peterson's job duties from Antonellis (who CNA describes in its submissions to this Court as a "random individual identified by Peterson who was no longer even employed by CBS and was not selected by CBS to provide such information.") (Weber Aff. at 14–15). CNA did, however, request further verification from CBS of Peterson's job duties. On September 1, 1998, CBS's Human Resources Department forwarded an additional copy of the Employer's Job Activity Statement; it essentially repeated the job description submitted earlier by Toohey—with the modification that Peterson's job duties included "simple grasps." CBS still did not describe what Peterson's job duties were, only the physical activities that were or were not required.

The CNA Appeals Committee ordered that Peterson's medical records be reviewed by an independent board certified neurologist, Dr. Ronald E. Oppenheimer. Oppenheimer concluded that there was "no reason why [Peterson] would not be able to resume his job or a job with similar job requirements." The job the neurologist was referring to was, of course, the virtually duty-less desk job in which CBS had placed Peterson when it became painful for him to perform his duties in Nagano. (Weber Aff. at 15). Oppenheimer did recommend against any job that required repetitive hand motions.

The Appeals Committee also sought further clarification of the discrepancy between Peterson's own description of his job and the statements prepared by CBS. In an e-mail from Richard Clement of CNA and Anthony Ambrosio of CBS, CNA noted that the discrepancy in the job description lay between Mr. Toohey's description of the job as consisting of "general office work" and having "light" physical demands, and Peterson's description—now bolstered by the letter from his former boss, Antonellis—that the job entailed "setting up temporary office sites and trailers, moving and setting up furniture, supervising runners and subcontractors, arranging for camera towers, and providing supplies. On location, they state, such physical activity can occupy up to 30% of [a] production manager's time ... they shoveled snow, crawled behind trailers to scare away rats, provided housing accommodations for VIP's in which they had to carry mattresses up flights of stairs, etc." (Ex C of Weber Aff. at 224). The e-mail goes on, "Further complicating this situation is that Mr. Peterson was taken off the Nagano Olympics and *accommodated in a job for eight months.*" *Id.* (emphasis added). The "accommodated" job referred to by CNA is, of course, the very job CBS was claiming as Peterson's "own" or "regular" occupation for the purposes of its Disability Plans.

In response to this e-mail, CBS submitted Peterson's time attendance records for the period 1997 until his termination in 1998. (Exh. C of Weber Aff. at 212–214). These records confirmed that Peterson spent a substantial amount of time out of the office and on the road prior to the onset of his disability in September 1997. They also showed a number of absences after the onset of his back problems.

Nonetheless, the Appeals Committee determined that Peterson was not "totally disabled" within the meaning of either the Short– or Long–Term plans, in that he was capable of performing the functions of the sedentary job CBS assigned him beginning in September 1997. On October 6, 1998, the Appeals Committee informed Pe-

terson that it was upholding the earlier denial of his claim.

*The Law*

Summary judgement is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the non-moving party's burden to "demonstrate to the court the existence of a genuine issue of material fact." *Lendino v. Trans Union Credit Info. Co.,* 970 F.2d 1110, 1112 (2d Cir.1992). In opposing summary judgment, a party may not rest upon unsupported allegations or denials, or simply claim without support that evidence adduced by the movant in support of the motion is not credible. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mycak v. Honeywell, Inc.,* 953 F.2d 798, 801–802 (2d Cir.1992).

### A. The Long–Term Disability Claim

■ This Court has already held that the arbitrary and capricious standard will be applied to review of the denial of Peterson's Long–Term disability claim. Under the arbitrary and capricious standard, the decision of a claim Administrator shall not be overturned unless it is found to be 1) without reason; 2) unsupported by substantial evidence; or 3) erroneous as a matter of law. *See O'Shea v. First Manhattan Co. Thrift Plan & Trust,* 55 F.3d 109, 112 (2d. Cir.1995) (citations omitted); *Pagan v. NYNEX Pension Plan,* 52 F.3d 438 (2d Cir.1995). The arbitrary and capricious standard pays great deference to the administrative decision makers, *see Flynn v. Local One Amalgamated Lithographers of America Sickness and Accident Fund,* 18 F.Supp.2d 263 (S.D.N.Y.1998), but the reviewing court must consider whether the claim determination was based on a consideration of relevant factors and whether there has been a clear error of judgment. *See Pagan,* 52 F.3d at 442.

The issue to be decided is whether the Claim Administrator's denial of Peterson's claim, on the ground that he was not disabled from the position he filled between September 1997 and May 1998, was without reason or substantial evidence, or was erroneous as a matter of law. In deciding this issue, the Court confines its analysis to the evidence available in the administrative record and the plain language of the Long–Term Disabilities Plan. The nature and extent of Peterson's physical disability is irrelevant to this narrow question.

The Long–Term Disability Plan required that the Claim Administrator determine whether Peterson was "continuously unable to perform the substantial and material duties of [his] *regular occupation,*" and "not gainfully employed *in any occupation for which [he was or became] qualified by education, training or experience.*" The Claim Administrator accepted as the basis for its determination CBS's description of what Peterson did after he was removed as the on-site production manager in Nagano in September 1997—a job which both parties agree required little or no physical activity, and which, if Plaintiff is believed, was pure make-work. CNA argues that, because Peterson was employed by CBS up through May 15, 1998, the "substantial and material duties of his regular occupation" should be those that he performed up to and through the date he terminated his employment—even if that assignment constituted "light duty," or, in the words of CNA, an "accommodation" to the fact that he could not perform the job he was supposed to be doing. Peterson does not dispute that he could sit at a desk and talk on the telephone, which is apparently all he did during the eight months leading up to May 1998. However, he claims that an accurate description of the "substantial and material duties of his regular occupation" included the things he did prior to his early return from Japan.

Peterson is correct. The Claim Administrator must, in interpreting and applying the plan, determine whether a claimant is

unable to perform the "substantial and material duties of his *regular* occupation." Thus, the issue is whether CNA acted arbitrarily and capriciously in interpreting the phrase "substantial and material duties of his regular occupation" to be the things Peterson did while he was being "accommodated in a job" (to use CNA's own words), rather than performing the types of duties he had carried out at CBS for many years. Viewed in that light, my determination that the Administrator's decision was arbitrary and capricious should be a foregone conclusion.

It is well established that where a policy reserves the right of the Plan Administrator to interpret the terms of the policy, courts generally defer to those interpretations. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Here, the Long–Term Plan provides that "The Administrator and other Plan fiduciaries have discretionary authority to interpret the terms of the Plan and to determine eligibility for an entitlement to benefits in accordance with the Plan."[1] Weber Aff. Exh. B at 34. This discretion is not without limits, however. Where the plain language of the plan points clearly to one interpretation, an Administrator would be acting in an arbitrary and capricious manner if he were to adopt a contrary interpretation. *See Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan,* 698 F.2d 593, 599 (2d Cir.) *cert. denied,* 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108, (1983). There are, for example, disability plans that provide benefits only when the claimant is disabled from performing any job—in fact, CBS's plan so provides after a 24 month period. But for the first 24 months, CBS's Long–Term Disability Plan affords benefits if the claimant has been disabled from performing the duties of his "regular occupation," not "any occupation." The question, then, is what the words "regular occupation" mean.

The term "occupation" is defined as:

An activity serving as one's regular employment: VOCATION. *Webster's II New Riverside Dictionary* (1994) at 813; or

the principal business of one's life: a craft, trade, profession or other means of earning a living.... *Webster's Third New International Dictionary* (1986).

The word "regular" is defined as "customary, usual, or normal." *Webster's II New Riverside Dictionary* (1994) at 990.

In the context of disability plans, the Second Circuit has held "regular occupation" to mean "a position of the same general character as the insured's previous job, requiring similar skills and training and involving comparable skills, training and duties." *Kinstler v. First Reliance Standard Insurance Co.,* 181 F.3d 243, 252 (2d Cir.1999) (quoting *Dawes v. First Unum Life Insurance Co.,* 851 F.Supp. 118, 122 (S.D.N.Y.1994)). As in the instant case, *Dawes* stated a claim under a group Long–Term disability insurance policy issued to the plaintiff's employer. There, as here, the parties disputed what constituted the claimant's "occupation" for the purposes of determining benefits under the plan. The Court determined that one's "occupation" is not a transitory or temporary arrangement, but a well-identified vocational category defined by a set of comparable skills, training and duties. *See Dawes,* 851 F.Supp. at 122.

---

1. The May 7, 1999 oral decision of this Court to apply the arbitrary and capricious standard predated the June 15 Second Circuit decision in *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243 (2d Cir.1999), a case deciding benefits under a Long–Term disability plan similar to the plan at issue here. The Second Circuit held, *inter alia,* that, in the absence of explicit reservation of discretionary authority to an ERISA plan administrator, the *de novo* standard of review should be applied to all issues concerning denial of ERISA benefits. The case at bar is distinguishable from *Kinstler* in that the Plan Administrator explicitly retained discretion to interpret the terms of CBS's Long–Term Plan; in *Kinstler,* no such authority was conferred.

■ Here, Peterson's "regular occupation" was Venue Production Manager. All the evidence in the administrative record demonstrates that a venue production manager sets up and maintains production facilities for on-location ("venue") television broadcasts of sporting events. As such, his substantial and material duties included traveling, moving equipment, preparing site space, shooing away vermin, and all the other activities Peterson and Atonellis, his former supervisor, described to the Administrator. It is thus clear that the Administrator was "arbitrary and capricious" in interpreting Peterson's "regular occupation" as that of a desk clerk assigned to the New York office. This work was both temporary and an accommodation to his physical limitations.[2] Whether or not he could do that job was and is irrelevant under the terms of the plan.

The cases cited by CNA do not support its argument that it was reasonable for the Administrator to rely on CBS's description of an accommodation job when it considered what Peterson's regular occupation was. On the contrary, case law in the Second Circuit and elsewhere supports the conclusion that the work performed by disability claimants *after* the onset of their disabilities is not the proper measure of their "occupation." *See Klein v. National Life of Vermont*, 7 F.Supp.2d 223 (E.D.N.Y.1998); *George v. Unum Life Ins. Co.*, No. 93 Civ. 2916, 1996 WL 701018 (S.D.N.Y.1998). *Cf. Zimmer*, 1999 WL 76896; *Brown v. Seitz Foods., Inc. Disability Benefit Plan*, 140 F.3d 1198 (8th Cir.1998). The proper measure of a claimant's "occupation" is the job he performed over a course of time prior to the onset of the disability. *See Klein*, 7 F.Supp.2d at 224 n. 3.

Because Peterson continued to work for CBS after he developed his physical symptoms, Defendant argues that he is not entitled to disability benefits, as a matter of law. It cites *Zimmer v. Reliance Standard Life Insurance Co.*, No. 96 Civ. 5918, 1999 WL 76896 (S.D.N.Y., Feb. 11, 1999), where the court granted summary judgment for the defendant where the disabled employee continued to work, even after a physician recommended that he cease working.

But this case is distinguishable from *Zimmer*. There, the plaintiff, acting against his doctor's recommendation, continued to carry out the exact same duties after the onset of his symptoms that he had performed before he became disabled. For that reason, Judge Patterson held that he could not possibly be "totally disabled." Here, Peterson stopped doing his regular job when he developed symptoms, and CBS—aware of a long-time employee's disability—moved him from a job involving much physical activity to a desk job in which little or no physical activity was required. Peterson, unlike Zimmer, did not continue to perform the same duties he had performed prior to his physical deterioration. Thus, *Zimmer* is inapposite.

The "non-occupational" nature of Plaintiff's duties during his last eight months at CBS is further proof that Peterson was not performing the "substantial and material duties of his regular occupation" after his return from Nagano. On the record before me, it would seem that Peterson had no substantive duties. Despite Defendant's assertions to the contrary, sitting for seven out of eight hours is not an "occupation." Lifting the telephone and grasping office supplies are likewise not "occupations," in either the legal or commonsense meaning of the word. CBS has

---

2. It was not, however, as Plaintiff asserts, an "accommodation" within the meaning of the Americans with Disabilities Act (ADA). The ADA defines an "accommodated" position as one in which "an individual with a disability ..., with or without reasonable accommodation, can perform the essential function of the

employment position that such individual holds or desires." 42 U.S.C. § 12111(8). CBS did not accommodate the essential functions of Peterson's occupation, but rather hired a replacement to perform the essential functions of his occupation.

never told either CNA or this Court what Peterson was supposed to be doing while he was sitting at his desk seven hours a day. When asked for specifics about what Peterson did, it persistently told CNA what he *did not do* (lift, travel, etc.). And it couched its responses in terms of physical tasks rather than job responsibilities. Thus the Administrator had no evidence concerning Peterson's *job duties* during the post–September 1997 period. It therefore had no basis on which to conclude that the job of a "venue production manager" (Peterson's job title according to CBS) was sedentary in nature—especially in light of massive evidence that, ordinarily, the job was anything but sedentary.

By the same token, there is no evidence in the record to suggest that the "general office duties" described by CBS—answering the phone, operating a laptop computer—represented the kind of "gainful employment" for which Peterson had become "qualified by education, training or experience." The record is silent about Peterson's education, training, experience and qualifications. The only evidence in the record addressing Peterson's prior jobs at CBS was provided to CNA by Peterson and by colleagues who submitted evidence on his behalf. This uncontradicted evidence indicates that, between 1992 and 1997, Peterson was engaged in an "occupation" that gave him managerial authority at remote production sites, which required him to travel, be on site at events and engage in setting up venues for remote television broadcasts—not "general office work." Peterson's education and training would appear to qualify him for a rather different type of work than he was performing during the post-Nagano months.

▉ I note, however, that this Court is not in a position to grant Plaintiff's cross-motion for summary judgment that he is entitled, as a matter of law, to the Long–Term disability payments. This is because Defendant has never considered whether Peterson was disabled from performing his "regular occupation"—his job prior to Sep-

tember 1997—or whether he could be "gainfully employed in any occupation for which [he was or became] qualified by education, training or experience." The current record is devoid of any analysis by the Claim Administrator that would measure Peterson's disability against either the substantial and material duties of a Venue Production Manager (his "regular occupation") or his ability to remain "gainfully employed in any occupation for which [he was or became] qualified by education, training or experience." Where the administrative record does not contain evidence that the court finds should have been considered, the proper result is remand to the Claim Administrator. *See Maida v. Life Ins. Co. of North America,* 949 F.Supp. 1087, 1093 (S.D.N.Y.1997) (noting that judicial efficiency and the intent of ERISA support remand pending final disposition).

I am thus remanding the claim back to the Claim Administrator, who should determine whether Peterson's medical condition-evaluated against the duties of his "regular occupation," rather than his temporary accommodation—entitled him to benefits under the Long–Term Plan. Because the Plan sets forth a tripartite test, the Administrator should also evaluate whether Peterson was disabled from being "gainfully employed in any occupation for which [he was or became] qualified by education, training or experience." During remand, this Court retains jurisdiction over the case. The defendant shall grant or deny Peterson's claim within 30 days of the earlier of (a) the expiration of the period within which the parties may submit evidence to CNA (including rebuttal evidence), or (b) the submission of any such evidence. The parties are directed to report the status of the remand to this Court on the 60th and 120th days after the date of this order.

### B. The Short–Term Disability Claim

This Court has ruled that it will review the Short–Term disability claim *de novo.*

Under the Short–Term disability plan, a "total disability" is defined to mean that the worker is "continuously unable to perform the substantial and material duties of *his or her own occupation," and* "not gainfully employed in any occupation *for which the Insured Employee is or becomes qualified, by education, training, or experience."* As with the Long–Term claim, Peterson does not dispute that he was able to perform the modified job duties he carried out between September 1997 and May 1998. Rather, he claims that the duties of his "occupation" were different from those put forward to the claim Administrators by CBS. This issue requires the same analysis as above.

The language of the Short–Term plan does not call for an analysis of the claimant's "regular occupation." It requires the Claim Administrator to make a determination of disability based on the substantial and material duties of the claimant's "own occupation." However, as one's "own occupation" is the occupation that one "owns," it is the same thing as one's "regular occupation." Having decided that CNA acted arbitrarily and capriciously when it did not measure the Long–Term disability claim against Peterson's "regular occupation," it follows that CNA acted unreasonably when it failed to measure his Short–Term claim against his "own occupation." This means the matter must be remanded for a proper claim determination, as to both Peterson's alleged short-term inability to perform his usual duties and whether he could have performed in any occupation for which he was qualified "by education, training or experience" during the weeks prior to August 10, 1998. The Administrator has made no finding that Peterson could perform any such occupation. The Administrator should adhere to the same timetable as above.

## C. Plaintiff's Leave to Amend the Complaint

■ Plaintiff's request for leave to amend the complaint to join CBS as a defendant and add a claim for penalties under ERISA on the basis that CBS failed to provide requested documents is denied. As is clear in the language of the Long–Term disability policy, CNA is the "Claim Administrator," not the "Plan Administrator" of that policy. Plaintiff therefore has no cause of action to assert against CNA under ERISA. *See Carner v. MGS–576 5th Avenue, Inc.,* 992 F.Supp. 340 (S.D.N.Y.1998).

■ Plaintiff also has no cause of action against CBS because he has failed to allege the elements necessary to obtain sanctions under 29 U.S.C. § 1132(c)(1)(B).[3]

There is nothing in the record to indicate one way or the other whether CBS responded to Plaintiff's requests of June 5, 1998—prior to CNA's denial of the claim—and October 16, 1998—after Plaintiff had retained counsel. CNA, however, did respond to Plaintiff's requests. Because the requests were for "all relevant plan documents," and because, at that time, Plaintiff's claim was still governed by the Short–Term Disability policy, CNA forwarded a copy of the Short–Term plan. There is no evidence that either Plaintiff or Plaintiff's counsel object to the information provided or ask for additional information.

■ The two primary factors to consider in awarding sanctions under this section of ERISA are prejudice to the plan claimant and bad faith on the part of the administrator. *See Lacoparra v. Pergament Home Centers, Inc.,* 982 F.Supp. 213, 229 (S.D.N.Y.1997). Here, CNA responded to

---

**3.** 29 U.S.C. § 1132(c)(1) provides in relevant part:

1. Any administrator ... (B) who fails to comply with the request for any information which such an administrator is required by this title to furnish to a participant or beneficiary ... within 30 days after

such request may· in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

the requests for the plan details by providing Plaintiffs with a copy of the Short–Term Disability Plan. Plaintiff made no further document request or request for clarification. Plaintiff went forward with his appeal to the Plan Appeals Committee of the denials under both the Long–Term and Short–Term policies; Plaintiff was thus not prejudiced in pursuing his claim. The fact that Plaintiff then filed this claim is no evidence of prejudice: this claim is a result of the denial of the *benefits,* not any failure to provide documentation. *See Lacoparra* 982 F.Supp. at 230. It thus appears that even if CBS had failed to respond—and even if CBS acted in bad faith (an issue on which the record is also devoid of evidence)—Plaintiff suffered no ill consequence as a result of that failure. Because I find that the Plaintiff was not prejudiced in any way, there are no grounds for the award of sanctions, and no grounds to add CBS as a defendant.

This constitutes the decision and order of the Court.