Abraham EGERT and Christine Kraft–Egert, Plaintiffs–Appellants,

v.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY and Employee Benefit Plan of the Canteen Corporation, Defendants–Appellees.

No. 89–2091.

United States Court of Appeals, Seventh Circuit.

Argued March 1, 1990.

Decided April 17, 1990.

Terence E. Flynn, Gessler, Flynn, Fleischmann, Hughes & Socol, Steven Saltzman, Chicago, Ill., for plaintiffs-appellants.

Jean F. Holloway, James A. Hardgrove, Sidley & Austin, Michael K. Lulich, and Gregory G. Lawton, Modesto, Reynolds & McDermott, Chicago, Ill., for defendants-appellees.

Before CUDAHY, FLAUM and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Christine Kraft–Egert wants to bear a child; an ectopic pregnancy and occluded fallopian tube, however, have left her infertile. She has turned to modern medicine—specifically, to in vitro fertilization ("IVF")—to allow her to do artificially what she cannot do naturally. Since she cannot afford the expensive procedure, she has asked her husband's medical insurance carrier, which reimburses the company's employees and their beneficiaries for services that treat "illness" (including pregnancy-related expenses), to cover the IVF treatments. But the carrier has refused to pay for the treatments because IVF will not cure her "illness"—it will not repair her occluded and deteriorated fallopian tubes—although it may permit her to conceive. Christine Kraft–Egert challenges the carrier's decision, complaining that her "illness" is her inability to conceive naturally, not the deterioration of her fallopian tubes. The question presented by this case is whether Christine Kraft–Egert's "illness," within the meaning of her husband's medical insurance plan, describes the occlusion of her fallopian tubes but not her infertility.

## I.

### A. The Employee Benefit Plan

Canteen Corporation provides its employees with an Employee Benefit Plan (the "Plan") pursuant to the terms of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. sections 1001 et seq. The Plan states that employees (and their spouses) will be reimbursed when "services or supplies provided are recommended by a Physician and are essential for the necessary care and treatment of an Injury or a Sickness." Appendix D at GM5800 11CM3. The Plan further states that "[s]ickness means a physical or mental illness"; pregnancy is expressly included in this same category. Id. at GM5800 9C4. Unfortunately, the Plan does not define "treat-

ment" or "illness." Connecticut General Life Insurance Company ("Connecticut General") processes and adjudicates claims made under the Plan.

To administer the benefits program uniformly, Connecticut General has compiled internal memoranda that outline appropriate applications of the Plan to individual circumstances. The Current Claims Practices (the "CCP"), as the compilation is known, contains a specific memorandum describing Connecticut General's policy regarding infertility; this section instructs Connecticut General claim offices to deny all claims for IVF reimbursement. The memorandum provides, in pertinent part:

> The purpose of this memorandum is to clarify our position on how to handle infertility expenses for claim payment. We will allow for procedures that attempt to rectify the progression of normal bodily function and the attempt to conceive naturally. However, when normal progression is no longer occurring, and appears to be medically incorrectable, it is at this point that artificial means to induce a pregnancy begins (procedures which occur outside of the body). We do not consider artificial means to induce a pregnancy essential for the necessary care and treatment of an illness, therefore expenses should be denied.
>
> .     .     .     .     .
>
> All expenses relative to the following procedures should be denied as not essential and necessary care and treatment of an illness, injury or covered pregnancy.
>
> .     .     .     .     .
>
> 2) INVITRO FERTILIZATION AND EMBRYO TRANSFER.

Appendix C at 7511/94 (emphasis removed).

At the same time, the CCP memorandum authorizes reimbursement for some procedures that treat infertility. For example, Connecticut General reimburses Plan participants for the surgical repair of deteriorated fallopian tubes. Connecticut General justifies its decision to reimburse participants for fallopian tube microsurgery because this procedure allows a participant to conceive naturally after the operation; on the other hand, Connecticut General refuses to reimburse participants for IVF because, even after successful treatments, the participant is still unable to conceive naturally: "Therein lies the 'fine line' involved in treatment of the illness of infertility (*in body happening*) versus assisting the body with treatment (*outside the body*) because the body's normal progression of attempts at conception are no longer occurring." *Id.* at 7511/97.

### B. Kraft–Egert's Claim for Benefits

In 1979 doctors surgically removed one of Christine Kraft–Egert's fallopian tubes during an ectopic pregnancy; her other tube has been blocked since at least 1986. As a result, she is unable to conceive children naturally. Kraft–Egert, nonetheless, sought medical help for her condition; she visited several doctors who confirmed that her only remaining fallopian tube had been blocked, but advised her that she might be a good candidate for IVF treatments. Subsequently, she underwent at least two IVF attempts, but neither attempt was successful.

After the first treatment, Kraft–Egert submitted a claim to Connecticut General for reimbursement of her IVF-related expenses. Connecticut General summarily denied her claim on January 5, 1987, stating that "treatment was not medically necessary for the care and treatment of an illness, injury, or pregnancy." Appellants' Brief at 15. Kraft–Egert appealed this decision on January 15, 1987, but this course proved to be no more successful. Connecticut General's Assistant Medical Manager, Roy Roper, wrote Kraft–Egert two letters explaining the denial. The first letter, dated January 28, 1987, notified Kraft–Egert that the IVF treatments were not covered:

> Connecticut General's internal guidelines governing administration of Canteen Corporation's medical plan, [sic] provide for reimbursement of expenses associated with diagnostic testing or surgery to rule out illness or injury, as it relates to infertility. However, services and relat-

ed expenses designed to induce pregnancy are not considered treatment for an illness or injury, and therefore, such expenses are not eligible for reimbursement under their group medical plan.

Appellees' Brief at 9. Roper added, however, that he had sent Kraft–Egert's file to Connecticut General's Home Office for final review. Roper's second letter, dated February 25, 1987, informed Kraft–Egert of Connecticut General's final determination denying her claim. Connecticut General subsequently told Kraft–Egert that it would reimburse her for fallopian tube microsurgery but not for IVF treatments.

Claiming that Connecticut General had violated the Plan, Abraham Egert and Christine Kraft–Egert brought suit pursuant to the provisions of ERISA, 29 U.S.C. sections 1132(a)(1)(B) and 1132(a)(3) (1982). The plaintiffs sought specific performance, prejudgment interest and attorney's fees. In an oral ruling delivered on April 28, 1989, the district court concluded that Connecticut General did not act arbitrarily and capriciously in interpreting the Plan to deny coverage for IVF treatments; the court therefore found for the defendants. The plaintiffs appeal from this ruling.

## II.

Both parties acknowledge that the Supreme Court's recent decision in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), controls our review of Connecticut General's final decision. There, the Court held that the "denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard *unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.*" *Id.* 109 S.Ct. at 956 (emphasis supplied). Since, in this case, Connecticut General has express discretionary authority under the Plan to make benefits determinations, the appropriate standard of review is "arbitrary and capricious." *Id.; see Reilly v. Blue Cross &*

*Blue Shield United of Wis.*, 846 F.2d 416, 419 (7th Cir.) (appropriate standard of review is whether the "decision or conduct was arbitrary, capricious or motivated by bad faith"), *cert. denied,* —— U.S. ——, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988).

Kraft–Egert argues in her reply brief that, in determining whether Connecticut General's denial of her claim was arbitrary and capricious, we should consider the potential conflict of interest faced by Connecticut General. This is not a frivolous concern; indeed, the Supreme Court recognized in *Firestone Tire* that a conflict of interest "must be weighed as a 'factor[ ] in determining whether there is an abuse of discretion.' Restatement (Second) of Trusts § 187, comment *d* (1959)." *Firestone Tire,* 109 S.Ct. at 956–57. Since Connecticut General underwrites large amounts of health insurance (where it is directly liable for payment of benefits) and presumably follows the same interpretations for its own underwritings as for plans where it is the administrator, it may have reason to minimize benefits payments with respect to plans where it is only the administrator. But Kraft–Egert did not express this concern until it was too late. Although she recited in her preliminary brief the Supreme Court's language about conflicts of interest, she did not allege until her reply brief that Connecticut General suffered such a conflict. Circuit Rule 28(f) states directly that "[a] reply brief shall be limited to matter in reply." And our cases on this point consistently declare that arguments withheld until the reply brief ordinarily will not be considered. *See, e.g., Wilson v. O'Leary,* 895 F.2d 378, 384 (7th Cir.1990) ("All arguments for reversal must appear in the opening brief, so that the appellee may address them."); *FTC v. World Travel Vacation Brokers, Inc.,* 861 F.2d 1020, 1025–26 (7th Cir.1988); *Duggan v. Board of Educ.,* 818 F.2d 1291, 1293 (7th Cir.1987). Thus, Kraft–Egert has waived this argument by failing to give Connecticut General a meaningful opportunity to respond in its brief.[1]

---

1. At oral argument, counsel for Connecticut General stated that Kraft–Egert did not raise

this issue below. Since Kraft–Egert's failure to argue this issue in her preliminary brief consti-

## III.

■ There is little question that the CCP clearly instructs Connecticut General's offices to deny IVF claims: "All expenses relative to the following procedures should be denied as not essential and necessary care and treatment of an illness, injury or covered pregnancy.... 2) INVITRO FERTILIZATION AND EMBRYO TRANSFER." Appendix C at 7511/94 (emphasis removed). Nonetheless, the treatment of IVF claims by the CCP—a compilation of secret, internal guidelines not disclosed to Canteen or to participants or beneficiaries of the Plan—is not dispositive here. The CCP is not the Plan: it is simply a set of memoranda designed to provide guidance to those interpreting the Plan. We therefore must determine whether this guidance forbidding reimbursement for IVF treatments is consistent with the terms of the Plan.

We have held that firms like Connecticut General cannot adopt *any* guidelines they choose and then rely upon these guidelines with impunity; rather, they may rely only upon those guidelines that reasonably interpret their plans. For example, in *Reilly v. Blue Cross & Blue Shield United of Wisconsin*, 846 F.2d 416 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988), we concluded that a Plan could not grant complete discretion to an internal advisory committee to pick and choose which claims would be reimbursed: "ERISA's provisions do not permit such potential abuses; decisions and their rationales are reviewable [for reasonableness]." *Id.* at 423. The focus of our inquiry, as suggested previously, must be on the reasonableness of Connecticut General's interpretation in the CCP of the Plan itself.

In its oral decision, the district court found that the CCP's provisions on IVF constituted a reasonable interpretation of the Plan. Trans. at 136. It is impossible to know, however, precisely *why* the district court thought that Connecticut General's interpretation was reasonable: without expressly stating the grounds for its decision, the district court simply concluded

that Kraft–Egert did not demonstrate that Connecticut General's denial was arbitrary and capricious. The district court seems to have relied upon the language in the contract (the Plan) and the CCP. This is curious, in part, because the district court acknowledged that the Plan does not clearly provide or preclude reimbursement for IVF treatments; it simply requires reimbursement for the treatment of illness, a term which is also undefined. Moreover, to the extent that the district court relied solely on the CCP without reference to "reasonableness," that reliance conflicts with our instruction in *Blue Cross*, 846 F.2d at 423. We surmise from the record, nonetheless, that the district court found that Kraft–Egert's illness consisted of her blocked fallopian tubes, not her infertility. Trans. at 136. Thus, the court seems to have concluded that Connecticut General reasonably refused to reimburse Kraft–Egert's claim for IVF treatments, which permit conception but do not ameliorate deteriorated fallopian tubes.

On appeal, the parties focus on whether it is "reasonable" for Connecticut General to approve reimbursement for microsurgery but to deny reimbursement for IVF when both procedures, if successful, achieve the same result: conception. It is no doubt true that the principal function served by the fallopian tubes—indeed, their only function—is to conduct an egg from a woman's ovary to her uterus. And it is also true that IVF performs the same function by circumventing the deteriorated fallopian tubes much like a dialysis machine allows physicians to circumvent failed kidneys. But the issue of whether IVF is a reasonable alternative to microsurgical repair of fallopian tubes is better left to doctors than to judges determining whether certain medical plans comply with the terms of ERISA. Even if Connecticut General acts "unreasonably" by allowing one form of treatment that permits conception while disallowing another, that by itself does not violate the Plan in effect here between Canteen and the Plan's participants. Indeed, Kraft–Egert admits that

tutes waiver, we need not consider whether she     raised it before the district court.

Connecticut General can act "unreasonably" in just this way, so long as Connecticut General "specifically excludes" reimbursement for IVF treatments *in the Plan*.[2] The only question we need address regarding "reasonability" is whether, in the absence of specific Plan language, Connecticut General reasonably denied Kraft–Egert's reimbursement claim for IVF treatments.

The Plan provides that reimbursement is authorized when "services or supplies provided are recommended by a Physician and are essential for the necessary care and treatment of an Injury or a Sickness." There is no dispute here that a physician recommended IVF for the treatment of Kraft–Egert's infertility. But to obtain reimbursement, Kraft–Egert must also demonstrate two things: first, that her infertility is an injury or a sickness, and second, that IVF is essential for the necessary care of her infertility. If she makes this demonstration, the terms of the Plan require reimbursement.

First, whether infertility is an injury or illness is an issue we do not tackle lightly. Each party presents credible arguments on its behalf; Kraft–Egert submits that infertility is an "illness," as the term is used by the Plan, because infertility is a pregnancy-related expense and because the CCP specifically authorizes reimbursement for microsurgery to repair deteriorated fallopian tubes, which, when functioning properly, allow fertility. Further, she adds, the only purpose of the fallopian tube—to permit conception—renders meaningless any distinction between fallopian tube deterioration and infertility. On the other hand,

Connecticut General argues that infertility is not an "illness" but is simply the result of an "illness," more properly described as deteriorated fallopian tubes. In the abstract, given the arbitrary and capricious standard of review, we would be reluctant to disturb Connecticut General's decision.

But we need not address this question in the abstract. Connecticut General refers expressly to illness and infertility in its CCP section on infertility. There, Connecticut General discusses the *"illness of infertility."* App.C at 7511/97 (emphasis supplied). And earlier in the CCP, it requires claim offices to discover a "[p]atient's complete medical history as it pertains to the *diagnosis of infertility."* *Id.* at 7511/94 (emphasis supplied). These passages undermine Connecticut General's litigating position that it does not consider infertility to be an illness or sickness within the terms of the Plan. *See Blue Cross*, 846 F.2d at 420 (citing *Dennard v. Richards Group, Inc.*, 681 F.2d 306, 318 (5th Cir.1982) (court must analyze "uniformity of construction" and "fair reading" of Plan to determine whether interpretation is arbitrary and capricious)).

Second, we must consider whether IVF is essential for the necessary care or treatment of Kraft–Egert's infertility. Again, this is a close question. Kraft–Egert argues that IVF is essential because she will not be able to conceive without the treatments; Connecticut General responds that IVF is not essential because it cannot make her fertile again unlike microsurgery (covered by the Plan) which might repair her fallopian tubes.[3] But Connecticut Gener-

---

**2.** Kraft–Egert acknowledges that Connecticut General could have expressly refused *in the Plan* to cover IVF treatments: "Connecticut General can specifically exclude a particular treatment, whether essential or not, by adding such an exclusion to the express language of the Policy. [But] [t]hat is exactly what Connecticut General . . . did not do before this litigation arose." Appellants' Brief at 21 n. 5.

**3.** The parties dispute the availability of an alternative medical option—microsurgery—to treat Kraft–Egert's infertility. Kraft–Egert argues that IVF was her only treatment option, while Connecticut General maintains that Dr. Norman Gleicher, Kraft–Egert's second doctor, acknowl-

edged that both IVF and microsurgery were available procedures for her. We view this disagreement as substantially irrelevant to our inquiry. Neither party claims that the Plan requires a participant to choose a specific surgical procedure to treat illness *if* two procedures are covered. Further, the availability of two potential procedures does not necessarily mean that neither is "essential" within the meaning of the Plan: a dying patient, for example, may be indifferent to whether he receives life-saving Medicine A in the form of a tablet or life-saving Medicine B in the form of a liquid, so long as he receives one of these "essential" medicines to treat his disease.

al's analysis is undermined by the Plan's treatment of infertility: the *Plan itself* authorizes coverage of services "provided in connection with family planning counseling or counseling for treatment of infertility." Appendix D at GM 5800 11CM3 V–36(2) Spec. Surely, counseling does not address the underlying causes of infertility; after several sessions with a trained counselor, it is unlikely that Kraft–Egert's fallopian tubes will somehow repair themselves and allow her to conceive naturally in the future. Indeed, the Plan's treatment of counseling for infertility seems to conflict directly with Connecticut General's explanation of its refusal to cover IVF treatments: "IVF clearly does not 'treat' infertility because, even in the event of a successful IVF, the patient is no more capable of conceiving children naturally than she was before the procedure." Appellees' Brief at 20. Infertility counseling will not allow a patient to conceive (naturally or artificially), nor will it treat the underlying causes of mental anguish: the infertility itself. Still, the Plan covers that procedure but not IVF, which may allow a patient to conceive artifically.

Since the Plan clearly authorizes reimbursement for the treatment of "illness," since Connecticut General has described infertility as an "illness" in its own internal guidelines and since provisions of the Plan contradict Connecticut General's explanation of why IVF is not essential for the necessary care of infertility, we believe the Plan requires Connecticut General to authorize payment for Kraft–Egert's IVF treatments. At the very least, provisions of the CCP—upon which Connecticut General relies so heavily to construe the terms of the Plan—are substantially inconsistent and lead to contradictory dispositions of similarly situated claims. *See Blue Cross*, 846 F.2d at 420 (citing *Dennard*). In either event, we regard Connecticut General's denial of Kraft–Egert's claim to be arbitrary and capricious.[4]

## IV.

■ Connecticut General asserts in its brief that, even if its denial of coverage for the IVF treatments was arbitrary and capricious, Kraft–Egert is not entitled to seventeen months of IVF coverage (the period during which Connecticut General refused to provide reimbursement). To support this assertion, Connecticut General argues that such a request amounts to a claim for extra-contractual damages, which generally are not allowed in ERISA actions.[5] *See Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985).

This is not the first time Connecticut General has made this claim. Indeed, Connecticut General previously filed a motion to dismiss Kraft–Egert's case for mootness. Magistrate Elaine E. Bucklo, who heard the motion, expressly considered this

---

**4.** Having reached this conclusion, we need not consider Kraft–Egert's allegation that Connecticut General developed its CCP without properly consulting medical experts.

**5.** Connecticut General also argues that its offer to reimburse Kraft–Egert for her future IVF treatments renders this case moot. Connecticut General limited its offer, however, by stating that Canteen might modify the Plan (shortly after the settlement offer) to exclude IVF treatments, and that the modified Plan would be applied to Kraft–Egert.

There is no doubt that Canteen may modify its Plan to exclude reimbursement for IVF treatments. But to demonstrate that this case is moot, Connecticut General must show that its offer provides the relief requested by Kraft–Egert. It has failed to make this showing. The record suggests that Kraft–Egert may have refrained from receiving IVF treatments in 1987 and early 1988 because of Connecticut General's

initial refusal to reimburse her for her claims. Thus, Connecticut General's offer to reimburse her for the one treatment she sought during this period does not represent an offer to reimburse her for all the treatments she *would have sought* had Connecticut General properly interpreted the Plan. There is, therefore, a substantial difference between Kraft–Egert's request—prospective coverage for a period of months equal to Connecticut General's refusal to provide reimbursement—and Connecticut General's offer—reimbursement for actual treatments rendered during the denial period. The only prospective relief offered by Connecticut General—the period between the August 1988 settlement offer and the modification of the contract in January 1989—is insufficient to provide a complete remedy for the period of Connecticut General's initial denial—from January 1987 to August 1988. Hence, the case is not moot.

issue and concluded that Kraft–Egert's request was a claim "under 29 U.S.C. § 1132(a)(1)(B) to 'enforce [her] rights under the plan,' and not a claim for extra-contractual relief." Report and Recommendation at 8 (N.D.Ill. Jan. 19, 1989). Thus, she denied Connecticut General's motion.

At this point, Connecticut General could have filed a written objection in the district court disputing Magistrate Bucklo's conclusion, but it failed to do so. *See* Fed.R. Civ.P. 72(b); 28 U.S.C.A. § 636(b)(1) (West Supp.1989). We have previously held that a party's "failure to file objections [to the magistrate's report] with the district judge waives the right to appeal all issues, both factual and legal...." *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir.1986); *see Lockert v. Faulkner*, 843 F.2d 1015, 1017 (7th Cir.1988).[6] And Magistrate Bucklo warned the parties that

> [w]ritten objections to any finding of fact, conclusion of law, or the recommendation for disposition of this matter must be filed with the Honorable Nicholas J. Bua within ten (10) days after service of this Report and Recommendation. *See* Fed.R.Civ.P. 72(b). *Failure to object will constitute a waiver of objections on appeal.*

Report and Recommendation at 12 (address page) (emphasis supplied). Connecticut General's refusal to heed this warning constitutes a waiver of its right to have this court review the magistrate's findings. We therefore decline to do so.

## V.

There is no question that the Plan in effect between Canteen and its employees (and their beneficiaries) authorizes reimbursement for medical services that treat illness. The administrator of Canteen's Plan, Connecticut General, promulgated an internal compilation of guidelines to be followed in interpreting the Plan. Although these guidelines advise Connecticut General's claim offices to deny IVF claims, they also describe infertility as an illness, which, by definition, entitles a participant to reimbursement under the Plan. Despite this entitlement, Connecticut General refused to reimburse Kraft–Egert for approved medical procedures to treat her "illness of infertility." We conclude from these circumstances that Connecticut General arbitrarily and capriciously denied Christine Kraft–Egert's claim for IVF treatments. Consequently, we reverse and remand the cause so that the district court may determine the proper scope of relief in accordance with this opinion.

REVERSED and REMANDED with instructions.

---

**6.** This reasoning is not limited to the decision to take an appeal, as argued by Connecticut General; rather, the failure to file timely, written objections ordinarily waives either party's right of appellate review of these issues. *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B) (en banc), *on remand*, 677 F.2d 410 (5th Cir. Unit B 1982). This conclusion comports with the principal objectives of the Federal Magistrates Act, 28 U.S.C. section 631 *et seq.*, which include the efficient administration of justice. *See, e.g., United States v. Schronce*, 727 F.2d 91, 93–94 (4th Cir.), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984); *Nettles*, 677 F.2d at 406–10; *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604–05 (1st Cir.1980).