Joseph J. PETERSON, Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY, Defendant.

No. 99 CIV. 0847(CM).

United States District Court, S.D. New York.

Oct. 23, 2000.

---

**534**

Mark Scherzer, A. Christopher Wieber, New York City, for Plaintiff.

Randi F. Knepper, Del Mauro, DiGiamo & Knepper, New York City, for Defendant.

MEMORANDUM DECISION AND OR-DER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDG-MENT AND DENYING DEFEN-DANT'S CROSS–MOTION FOR SUMMARY JUDGMENT.

MCMAHON, District Judge.

*Summary*

Peterson filed this action against Continental Casualty Company ("CNA") seek-ing benefits under short- and long-term disability benefit plans established and maintained by Peterson's former employ-er, CBS Broadcasting, Inc., under the Em-ployee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), and (e)(1). In a prior opinion, *Peterson v. Continental Cas. Co.,* 77 F.Supp.2d 420 (S.D.N.Y.1999), this Court denied summary judgment to both parties and remanded the claims back to Claim Administrator for a proper determi-nation under the terms of the Plans. The Claim Administrator again denied Plain-tiff's claims.

Defendant moves for summary judg-ment affirming the denial and dismissing the case. Plaintiff seeks summary judg-ment that he is entitled to the claimed benefits. For the reasons that follow, De-fendant's motion is denied and Plaintiff's motion is granted.

I.

BACKGROUND

Plaintiff Joseph Peterson was employed by CBS for over 37 years, beginning in the mail room and working his way up to the position of "Venue Production Manager." In September 1997, while in Nagano, Ja-pan in preparation for CBS' coverage of the 1998 Winter Olympics, Peterson began suffering acute pain. He returned to the United States for treatment, and subse-quently underwent two surgeries to treat bilateral carpal tunnel syndrome in both his hands. His treating physicians also diagnosed injury to his back. From Sep-tember 1997 to March 1998, CBS reas-signed Peterson to a desk job in New York City, which did not demand any strenuous physical activity. In mid-May 1998, Peter-son concluded that he would not be able to resume his old job as a venue production manager and applied for disability benefits under the terms of CBS' Short- and Long-term Disability Plans. He was granted short-term disability benefits from March

15 to August 10, 1998, while Defendant reviewed his claim.

CNA denied the claim on the ground that Plaintiff was not disabled within the meaning of the Plans. Plaintiff's internal appeals of the denial of benefits failed; this lawsuit followed.

### A. *The Plans*

An employee is entitled to coverage under the Long–Term Plan ("LTD") upon providing proof of a continual total loss of ability to carry out his job. In the Group Long–Term Disability Insurance Plan, "Total Disability" is defined as follows:

> "Total Disability" means that, during the Elimination Period and Your Occupation Period [defined in the schedule as 24 months] shown in the Schedule of Benefits, You, because of Injury or Sickness, are:
>
> (2) continuously unable to perform *the substantial and material duties of Your regular occupation;*
>
> (3) under the regular care of a licensed physician other than yourself; *and*
>
> (4) *not gainfully employed in any occupation for which You are or become qualified by education, training or experience.* (Weber Aff. Ex. A, R.21) (emphasis added).

The policy further provides that:

> After the Monthly Benefit has been payable for Your Occupation Period, "Total Disability" means that, because of Injury or Sickness, You are:
>
> A. continuously unable to engage in *any occupation for which You are or become qualified by education, training or experience;* and
>
> B. under the regular care of a licensed physician other than Yourself.

(*Id.*) (emphasis added).

The Short–Term Disability Plan ("STD") employs sightly different language. Under the STD, a "total disability" is defined to mean that the worker is "continuously unable to perform the substantial and material duties of *his or her own occupation,"* *and* "not gainfully em-

ployed in any occupation *for which the Insured Employee is or becomes qualified, by education, training, or experience."* (R.4) (emphasis added).

In its earlier opinion, familiarity with which is presumed, this Court denied Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment on the ground that the Plan Administrator had failed to consider what Plaintiff's "regular" or "own" occupation was in determining whether he was disabled within the meaning of the two plans. *See Peterson v. Continental Cas. Co.,* 77 F.Supp.2d 420 (S.D.N.Y.1999). In denying the motions, I noted that CNA had improperly measured Peterson's disability against the duties he was performing at the temporary desk job—not against his "regular occupation" as a Venue Production Manager. I therefore remanded Peterson's claim under the LTD Plan to the Claim Administrator to:

> determine whether Peterson's medical condition—evaluated against the duties of his "regular occupation," rather than his temporary accommodation—entitled him to benefits under the Long–Term Plan. Because the Plan sets forth a tripartite test, the Administrator should also evaluate whether Peterson was disabled from being "gainfully employed in any occupation for which [he was or became] qualified by education, training or experience."

*Id.* at 429. I further remanded Peterson's claim under the STD Plan for a "proper claim determination, as to both Peterson's alleged short-term inability to perform his usual duties and whether he could have performed in any occupation for which he was qualified 'by education, training or experience' during the weeks prior to August 10, 1998." *Id.* at 430.

### B. *The Administrative Record*

Following the remand order, CNA requested and received from CBS a Physical Demands Analysis ("PDA"), signed by John Toohey, Associate Director of Admin-

istration for the 1998 Olympics, which described the following work activities: (1) 10 to 14 hour days, with a 6 to 7 day workweek; (2) use of computer, telephone, and calculator (although no breakdown of the amount of time so occupied); (3) standing and walking for 2–hour blocks of time; (4) one-handed "control," motor vehicle operation, and twisting of the head for 33% to 66% of working time; (5) a range of other activities (climbing, stooping, crouching, bending, twisting, reaching and finger dexterity) from anywhere from 0% to 33% of the time; (6) working in conditions of extreme cold and wet, with the presence of moving equipment, slick floors, and while handling materials. (R.R.43–44.) [1] Where the PDA asked the question "Are other jobs available in your company that require *similar ability* but requires [sic] *less physical effort*?" Toohey responded "No." (R.R.43.) (emphasis in original).

Peterson also submitted to CNA additional evidence supporting his disability claim, including, *inter alia,* medical records, an updated expert opinion from a neurologist, a resume of Peterson's prior work history, newspaper clippings and job recommendation, and an e-mail statement from Darcy Antonellis, who served as CBS' Vice President of Operations for the 1998 Winter Olympics. (Wieber ltr. to Sauerhoff, Jan. 27, 2000 (R.R.90–96); Wieber Ltr. to Sauerhoff, Feb. 2, 2000 (R.R.50–52)). This evidence supplemented his earlier submissions concerning his job duties, which included letters from Sharon Drankoski (a CBS venue production manager), David Graham (a CBS technical manager) and an earlier letter from Antonellis.

Drankoski stated:

[A] remote production manager is responsible for providing the non-technical physical plant and supplies necessary to permit a television broadcast from a remote location. Typically, this involves both the preparatory work—such as renting equipment and furniture, purchasing supplies, and hiring subcontrac-

tors and caterers, etc.—and work at the venue itself—such as setting up temporary office sites and trailers, moving and setting up furniture, supervising runners and subcontractors, arranging for camera towers, providing supplies like water, paper, tape racks, and other office-type-supplies. Although a production manager at a major venue will frequently have runners available to handle many of the necessary physical activities, *it is expected and understood that the production manager will do whatever the situation—due to urgency or lack of staffing—demands. On location, such physical activity can occupy up to 30% of the production manager's time....*

(R.R.28) (emphasis added). Examples of some of the things Drankoski performed at venues included scaring away rats, lugging a mattress up a flight of stairs and shoveling snow.

Graham stated that he had worked alongside Peterson at the Olympic assignment, as well as at several prior remote broadcast locations, dating back to Peterson's work at the broadcast of the 1988 Presidential Inauguration:

On several broadcasts, Mr. Peterson and I had to operate equipment such as forklifts, (both standard warehouse type as well as large crane lifts) and have trained others to operate them. On one occasion, at Congressional Country Club in Potomac, MD, one of our technicians had a problem with a 30′ boom lift. It toppled against a scaffold tower that had been built as one of our camera positions. With Emergency Services personnel standing by, Mr. Peterson commandeered equipment from the Golf course superintendent, climbed aboard a precariously leaning lift, retracted the boom and righted the lift while hanging on the operator's cab so he would not fall out. *These are everyday challenges*

---

1. All citations to pages in the record on remand to the Claim Administrator are preceded by "RR"; all citations to the original administrative record are preceded by "R."

*presented to the management team assigned to a remote location.*

(RR.28) (emphasis added). Graham continued:

... on one of Mr. Peterson's last days in Nagano, last September, he and I uncrated and assembled a large desk-like unit which would contain monitors and other equipment for test event prior to the Olympics. Mr. Peterson and I also struggled with loading a 250 pound crate, approximately 3′ X 5′ X 6″ deep into a vehicle for transportation to a remote site. Elements as these are so normal I had to make a point of remembering the days prior to Mr. Peterson's medical circumstances.

(*Id.*)

He concluded:

...*The company is demanding more and more without acknowledgment. In short, the Production managers have to 'Do what has to be done' to get the Show on the Air.* Shipments and packages delivered to remote sites are rarely under 50lbs and sometimes over 200 lbs. The production manager is expected to deal with these items, sometimes prior to crews arriving at or after leaving the site.

(*Id.*) (emphasis added).

Graham also submitted an "Employer's Job Activities Statement" which showed medium physical exertion is required, specifically, lifting/carrying/pushing and pulling objects weighing up to 50 pounds.

Antonellis reported to the Claim Administrator that:

Typically, a Venue or Remote Production Manager will coordinate numerous logistics associated with setting up a broadcast facility for a given event. News, Sports, or Entertainment remotes make up the majority of assignments. . . . The planning and logistics associated with these events typically include making hotel and travel arrangements for the production crews, renting temporary trailers and bathrooms, arranging telecommunications, booking, catering, arranging local trans-portation for crews and talent, provisioning the entire site, coordinating event credentialing and access, maintaining financial records and P & L accountability, and numerous other tasks.

(*Id.* at 29)

She added, "While the job does require significant administrative work, it would be incorrect to consider it purely a 'desk job.'" (*Id.*)

After reviewing this information, and in light of this Court's remand order, CNA went back to Toohey for "further clarification" of the Physical Demands Analysis that he had completed earlier. (Claim Denial, RR.29.) The reader will recall that Toohey's PDA described a job that was anything but sedentary. (*See* I.B. ¶ 1, *supra*). However, in a telephone conversation with Claim Administrator Sauerhoff ( her notes of which were submitted to the record) Toohey told a rather different story.

He indicated that indicated that "Mr. Peterson was a Production Manager in the editing services department of the New York office for some time," and that Peterson was made a Production Venue Manager as a "special assignment" for the Nagano Olympics. (Sauerhopff Mem. to File, Mar. 28, 2000, RR.40.) Toohey told CNA that, in this special assignment as Venue Manager, Peterson was "responsible for visiting the various venue production cites [sic], seeing that crews that were hired were credentialed, arrange for catering services, in essence, supervise the overall production crews." (RR.29.) According to Toohey, college students were hired to work as "runners" and "[t]o perform the actual physical labor needed to complete the assignments." Toohey noted that there were occasions when Peterson assisted the crew in completion of an assignment, but, without quantifying how much time such activities might take up, concluded that *such physical activity was "a very insignificant part of the time and not considered to be a substantial and material duty of his occupation as a Venue Production Manager."* (*Id.*) (emphasis

added). "Mr. Peterson was hired and paid for services related to his organizational/supervisory and coordinating skills, not for manual or physical labor, which would have been delegated to 'runners.'" (*Id.*) Toohey claimed that, in any event, Peterson was pretty much finished with venue production at the Nagano site by September 1997—at the onset of his injury—and that Peterson's involvement at the site up to that time had focused on making catering arrangements, although he would have been expected to "operate a car, travel from one venue cite [sic] to another, walk about production cites [sic], which would include walking up and down remote locations and frequently observe the activity of the production crew, which would mean having to turn his head from side to side and looking about." (RR.29.)

Toohey also backtracked on CBS' position that Plaintiff's regular job was as a *"venue* production manager" (emphasis added). He told CNA that once the Olympics were over, it was CBS' intention to return Mr. Peterson to a Production Manager job in the editing department, a job which did not entail any strenuous physical demands.

CNA accepted the information supplied by Toohey—including his rather legalistic conclusion that physical labor was not a "substantial and material duty" of his occupation—and, apparently, rejected the information supplied by Antonellis, Graham and the others, as well as Toohey's original PDA. (RR.43–44.) CNA concluded:

> Given the information provided by Mr. Toohey and clarification in the physical discrepancies reported by others, Mr. Peterson was not *required* to lift crates and operate forklifts, nor was he being compensated at a salary range that mandated this type of physical labor. This is why subcontractors, runners, and production crews were hired. This does not mean that some physical activity was not required whatsoever [sic], or that Mr. Peterson would not take it upon himself

to assist as necessary, nor does [sic] the physical demands and activities reported by Mr. Peterson and others constitute the substantial and material duties of his occupation as a Venue Production Manager. *The substantial and material duties associated with a Venue Production Manager are primarily administrative and supervisory in nature, along with the ability to walk about and oversee the completion of tasks assigned to various workers.* This would constitute a sedentary to light duty level of physical performance.

(RR.30) (emphasis added).

CNA also reviewed the general job responsibilities/job description of a "Production Manager," (as opposed to a Venue Production Manager) which Toohey faxed to the Claim Administrator. This rather meager job description (which is not equivalent to the more extensive PDA that Toohey submitted for the Venue Production Manager's job), simply states that a production manager needs knowledge of production finance, manpower/facility scheduling and some knowledge of computers. This description did not say specifically what kinds of work Peterson had engaged in as a Production Manager in the years before his promotion to Venue Production Manager. Nevertheless, based on this short description, CNA concluded that a Production Manager would only need to be able to perform "light to moderate keyboard operation, conversations and discussions, use of a telephone, and periodic operation of routine office or electric [sic] equipment." (RR.30.)

*Evaluating Peterson's Physical Limitations*

Having determined that the neither a Venue Production Manager nor a Production Manager is required to engage in strenuous physical activities, CNA reviewed the medical records to make a determination if, under either the STD or LTD Peterson was qualified for the claimed benefits.[2] CNA did not ask for an

---

**2.** The medical records CNA stated it had reviewed consisted of the following: (1) Dr.

Frank Petito, records from November 5, 1997—August 5, 1998; (2) The Hospital for

updated medical evaluation from the opinion expert it retained during the first review of Peterson's claim. CNA concluded the following facts from the original records and the unreviewed supplemental medical records submitted by Peterson:

On September 17, 1997, Peterson developed numbness in his arms, from his elbows to his fingers, after stretching. "Peterson had cervical radiculopathy, but was not suffering from significant neurological deficits, nor did he have significant compression of the [spinal] cord." (RR.31.) He returned immediately to New York where he was "taken off the Nagano Olympics and accommodated in a job [at CBS]" *Peterson*, 77 F.Supp.2d at 424 (quoting E-mail from Richard Clement of CNA). Peterson underwent left carpal tunnel surgery on November 14, 1997, and right carpal tunnel release on March 9, 1998. A progress note of July 22, 1998 from Dr. McGormack (the physician who performed the carpal tunnel release) showed that, four months following carpal tunnel release on the right hand, Peterson was doing very well on that side with complete relief of his symptoms. However, Peterson continued to have symptoms of left carpal tunnel syndrome. "An EMG taken by Dr. Rubin on June 12, 1998 continued to show the presence of carpal tunnel syndrome on the left wrist and Dr. McCormack performed further surgery 6 months later on December 7, 1998." (Id.)

CNA concluded that Peterson's injuries "would not have prevented him from performing the substantial and material duties of his regular occupation beyond

May 15, 1998, to a more current date of the December 1998 surgery." (RR.31.) While acknowledging that "accommodations were made in September 1997," CNA concluded that "the medical evidence does not support a functional impairment that would have prevented Mr. Peterson from continuously performing the substantial and material duties of his occupation as Venue Production Manager, allotting for the normal recovery periods associated with open carpal tunnel release (42 days) per surgery." (RR.32.)

CNA's final determination was that:

[N]o further benefits are payable and the evidence submitted does not support a functional impairment or medical complications that would have prevented Mr. Peterson from working in his regular occupation beyond May 15, 1998, or that would compromise his ability to perform the substantial and material duties associated with his occupation as Venue Production Manager beyond September 1997, barring the surgical and recovery periods associated with the carpal tunnel release surgeries.

(RR.32.)

On April 26, 2000 Plaintiff's Counsel informed the Court that he had received the Claim Administrator's April 7, 2000 ruling, but that CNA's determination had been made on the basis of evidence that Peterson had not been given any opportunity to rebut—namely, the March 27, 2000 Physical Demands Analysis (which is essentially favorable to Peterson), the undated fax copy of job responsibilities/job description

Special Surgery, records dated March 10, 1998; (3) New York Hospital, records dated September 22, 1997—June 3, 1998, as well as in-patient records dated November 14, 1995—November 18, 1995; (4) Dr. McCormack, Jr., records dated March 4, 1998–March 9, 1999; (5) MRI of the cervical spine (performed by Dr. Irvin Kricheff), report dated September 23, 1997; (6) Dr. Michael Lavyne, report dated October 1, 1997; MRI of the cervical spine (performed by Dr. H. Dirk Sostman), report dated February 17, 1998; (7) Dr. Paul Cooper, report dated September 30, 1997; (8) EMG of Dr. Michael Rubin,

records dated February 17, 1998—June 12, 1998; (9) EMG dated December 9, 1997 (performed by Dr. Jeffrey Nelson); (10) Myelogram dated September 26, 1997; (11) Dr. Dae–Sik Rho, report of October 21, 1997; (12) Dr. Robert Barrett, records dated August 12, 1998—January 19, 2000; (13) Glenn Goldfinger, MA, PT, records dated September 30, 1997—November 17, 1998; (14) Dr. Dale Lange, EMG Reports dated July 25, 1998—July 30, 1998; and (15) prescription note of Dr. John Xethalis, dated September 30, 1997. (RR.30.)

for the position "Production Manager" and the contents of Toohey's telephone interview with Claim Administrator Sauerhoff. Plaintiff submitted on May 12, 200 a rebuttal letter to CNA, refuting Toohey's assertions about the job duties and job description. On June 29, 2000, CNA informed Peterson that it was standing by its denial. CNA issued no written opinion indicating that it had considered Peterson's rebuttal evidence.

## II.

## DISCUSSION

A. *Standard*

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the non-moving party's burden to "demonstrate to the court the existence of a genuine issue of material fact." *Lendino v. Trans Union Credit Information Co.,* 970 F.2d 1110, 1112 (2d Cir.1992). In opposing summary judgment, a party may not rest upon unsupported allegations or denials, or simply claim without support that evidence adduced by the movant in support of the motion is not credible. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mycak v. Honeywell, Inc.,* 953 F.2d 798, 801–802 (2d Cir.1992).

As held previously, the arbitrary and capricious standard applies to CNA's denial of the LTD benefits and the *de novo* standard applies to the denial of STD benefits.

Under the arbitrary and capricious standard, the decision of a claim Administrator shall not be overturned unless it is found to be (1) without reason; (2) unsupported by substantial evidence; or (3) erroneous as a matter of law. *See O' Shea v. First Manhattan Co. Thrift Plan & Trust,* 55 F.3d 109, 112 (2d Cir. 1995) (citations omitted); *Pagan v. NYNEX Pension Plan,* 52 F.3d 438 (2d Cir.1995). The arbitrary and capricious standard pays great deference to the administrative decision makers, *see Flynn v. Local One Amalgamated Lithographers of America, Sickness and Accident Fund,* 18 F.Supp.2d 263 (S.D.N.Y.1998), but the reviewing court must consider whether the claim determination was based on a consideration of relevant factors and whether there has been a clear error of judgment. *See Pagan* at 442.

Courts have held a number of different actions by claim fiduciaries to constitute arbitrary and capricious decision making: (1) ignoring relevant factors or failing to base the decision on substantial evidence, *see Miller v. United Welfare Fund,* 72 F.3d 1066 (2d Cir.1995); *Zuckerbrod v. Phoenix Mutual Life Ins. Co.,* 78 F.3d 46 (2d Cir.1996); (2) applying plan standards in an inconsistent manner, *see Brumm v. Bert Bell NFL Retirement Plan,* 995 F.2d 1433, 1440 (8th Cir.1993), *reh'g and reh'g en banc denied; Egert v. Connecticut General Life Ins. Co.,* 900 F.2d 1032 (7th Cir. 1990); (3) failing to obtain relevant expert advice, particularly once the plan participant has submitted an expert opinion in support of his claim, *see Miller,* 72 F.3d at 1073; (4) failing to obtain, or to otherwise request from a plan participant, particular kinds or types of evidence which the claim administrator requires to approve a claim, *see Booton v. Lockheed Medical Benefit Plan,* 110 F.3d 1461, 1463–64 (9th Cir. 1997); *VanderKlok v. Provident Life and Accident Ins. Co.,* 956 F.2d 610, 616 (6th Cir.1992); (5) disregarding actual plan provisions or constructively amending the plan by inserting new or different requirements, *see Lickteig v. Business Men's Assur. Co. of America,* 61 F.3d 579, 585 (8th Cir.1995); *Brumm,* 995 F.2d at 1440; *Kekis v. Blue Cross & Blue Shield of Utica–Watertown, Inc.,* 815 F.Supp. 571, 579 (N.D.N.Y.1993); and (6) failing to investigate or clarify disputed issues of fact and/or uncritically accepting the opinions of its own consultants, *see Crocco v. Xerox Corp.,* 956 F.Supp. 129, 140 (D.Conn.1997), *aff'd in part, rev'd on other grounds,* 137 F.3d 105 (2d Cir.1998), *Manginaro v. Wel-*

*fare Fund of Local 771, I.A.T.S.E.*, 21 F.Supp.2d 284, 305–306 (S.D.N.Y.1998), *Maida v. Life Ins. Co. of N. America*, 949 F.Supp. 1087, 1092–93 (S.D.N.Y.1997).

■ A review of a claim denial under the *de novo* standard requires that (1) plan terms "be given their plain meanings, ... the interpretations given by the average person," *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1084 (1st Cir.), *cert. denied*, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990); (2) the plan be read as a whole, *see Alfin, Inc., v. Pacific Ins. Co.*, 735 F.Supp. 115, 119 (S.D.N.Y. 1990); (3) the fiduciary must show that the claimants' interpretation is unreasonable and that its own interpretation is the only one that could fairly be placed on the policy, *see id.;* and (4) ambiguities in the plan be construed in favor of claimant, *see Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98, 107 (2d Cir.1991).

B. *CNA's Denial of Peterson's Claims Was Arbitrary and Capricious*

Plaintiff argues that CNA's decision to deny him LTD benefits was arbitrary and capricious because (1) CNA had no evidentiary basis for its determination of what constituted Peterson's "regular" or "own occupation"; (2) CNA's conclusion that physical activity was not a "substantial and material" duty of Peterson's job was erroneous as a matter of law; and (3) CNA failed to reach any determination about Peterson's ability to be gainfully employed in and any occupation for which he is "qualified, by education, training, or experience." Plaintiff also argues that Defendant's denial of his STD benefits fails under the *de novo* review because Defendant failed to apply the plain meaning of the Plan when it determined that, in the six months following the onset of his disability, Peterson was not disabled from his "own" occupation.

Plaintiff is correct.

**3.** Because CNA's claim denial is written is a conclusory fashion, it is difficult to parse

(1) *Vocational Analysis*

Prior to remand, CBS and Peterson agreed that Peterson's job was "venue production manager." (R. 261, R.42.) In its previous submission to this Court, CNA took the position that Peterson was a venue production manager, but that the position consisted of the duties he performed in the temporary accommodation job in New York. Based on this undisputed fact, the Court's order on remand was to analyze Peterson's claim against his "regular occupation" as venue production manager. *Peterson*, 77 F.Supp.2d at 429.

■ On remand, CBS injects for the first time the assertion that Peterson's 1996 job as venue production manager was temporary, and that his actual permanent position, the one to which he would have returned after Nagano, was "Production Manager" in the editing department in New York. The only evidence that this was *Peterson's* job are the notes taken by Claim Administrator Sauerhoff concerning a conversation she had with Toohey. CBS offers no evidence on this point, save for a fax to the Claim Administrator containing an undated description of qualifications required for a job entitled "Production Manager."

To the extent that CNA's claim analysis relied on Toohey's assertion that Peterson was a Production Manager destined for the editing department, and not a Venue Production Manager,[3] it is inconsistent with CNA's own earlier statement that Peterson was a Venue Production Manager—a concession (or an admission) that underlay this Court's prior decision, and that is binding on CNA in this action. Moreover, Toohey's unsupported and unverified assertions also stood in stark contradiction to all the other evidence in CNA's claim records, including sworn affidavits that tended to show that, whatever his title, Peterson had served as a manager at remote venues (not as production

which elements of Toohey's assertions CNA accepted.

editor in New York) for many years prior to the 1996 promotion. And there is no evidence in the record to suggest that Peterson was anything other than a Venue Production manager for eighteen months leading up to his disability.

◼ Furthermore, CNA never considered (or at least there is no evidence that it ever considered) Peterson's rebuttal evidence. Its failure to do so was not only unreasonable on its face, but was also in clear violation of this Court's order that such rebuttal evidence be considered. *Peterson*, 77 F.Supp.2d at 429.

I therefore reaffirm my earlier ruling (which was consistent with CNA's original position) that Peterson's "own" and "regular occupation" was the job of "venue production manager," not "production manager" in the editing department.

(2) *Strenuous Physical Activity Was a "Substantial and Material" Duty of Peterson's Occupation.*

The Claim Administrator's determination that physical activity was not a "substantial and material" duty associated with the venue production manger job was arbitrary and capricious.

CBS took the position that, as far as Peterson was concerned, strenuous physical activity was not a "substantial and material" duty of his job, and that a venue production manager could accomplish his job by supervising others to do the physical work and by merely being present at the remote broadcast site to look things over. CNA accepted CBS' assertion. CNA also concluded that, even if Peterson was disabled from carrying out strenuous physical activity, he could not be disabled from performing the "substantial and material" duties of his job if he was able to continue *any* of the duties of his job.

CNA's conclusion is *wrong* as a matter of law and the actual terms of the Plans CNA purports to have interpreted.

◼ The STD and LTD Plans provide that a participant is disabled if "unable to perform *the substantial and material*

*duties*" of his "own" or "regular" occupation. It does not require, as CNA argues in its briefs, that insured employees "should only be deemed totally disabled if they cannot perform *all* of the substantial and material duties of their occupation." (Def. Opp. Mem., at 10–11). Indeed, the Court of Appeal of this Circuit has held precisely the contrary.

In *Shapiro v. Berkshire Life Ins. Co.,* 212 F.3d 121 (2d Cir.2000), the Second Circuit held that a dentist who was physically unable to perform "chair dentistry," i.e., "the sum of procedures involved in treating dental patients in the dentists chair," was unable to perform the "substantial and material" duties of his occupation. 212 F.3d at 123. In so holding, the Circuit accepted as true the fact that other elements of the job—consulting with patients, planning treatment, filling out paper work, etc.—consumed at least ten percent of the dentist's time on the job. Nonetheless, the physical procedures were determined to be "substantial and material" to the occupation of a dentist, because his "administrative work was incidental to his material and substantial duties as a full-time dentist." *Id.* The Court specifically rejected defendant's argument that plaintiff was not totally disabled because he could still perform the administrative duties of his job, and had, in fact, continued to enjoy income from the administration of a dental practice. *Id.* at 124.

Other cases interpreting the phrase "substantial and material duties" have similarly held that it does not require a showing that plaintiffs be unable to carry out each and every job duty, or even a *majority* of the ordinary job tasks. *See, e.g., Stewart v. Penn.Mut. Life Ins. Co.,* 2000 WL 4152 (S.D.N.Y. Jan. 3, 2000) ("That plaintiff can still perform a substantial number of the duties she previously performed, however, does not necessarily mean that she can perform 'the substantial and material' duties of her job."); *Rosenthal v. Long–Term Disability of Epstein, Becker & Green, P.C.,* 1999 WL 1567863

(C.D.Cal. Dec. 21, 1999) (holding that it was arbitrary for administrator to conclude claimant able to "perform the important duties" of her job, based on her ability to function as an attorney for 8 to 9 hours a day, where her occupation as a litigation associate regularly required her to work 16 to 20 hour days); *Blasbalg v. Massachusetts Cas. Ins. Co.*, 962 F.Supp. 362 (E.D.N.Y.1997) (where total disability defined as "the substantial inability to perform the material duties of [the insured's] work," the focus of inquiry is "whether the insured can continue to perform 'in the usual and customary way.'"); *Primavera v. Rose & Kiernan, Inc.*, 248 A.D.2d 842, 670 N.Y.S.2d 223 (3d. Dep't.1998) (claimant deemed unable to perform "the material and substantial duties" of a "managing partner" of an accounting firm when able to continue accounting, but not managerial, functions.)

Moreover, the cases CNA cites for the proposition that the ability to perform some job duties disqualifies a claimant from receiving total disability benefits are distinguishable from the facts here. *See, e.g., Klein v. National Life of Vermont*, 7 F.Supp.2d 223 (E.D.N.Y.1998) (physician's medical activities not "substantial and material" where they occupied only 8–16% of time, generated only 2% of his income, and where claimant earned $500–$600,000 from the practice management activities); *Ditommaso v. Union Central Life Ins. Co.*, 1991 WL 249977 (E.D.Pa. Nov. 25, 1991), *aff'd*, 972 F.2d 1330 (3rd Cir.1992) (degree to which claimant engaged in pre-disability duties deemed "immaterial" because "plaintiff continues to earn his primary living ... [and] is still engaged in his regular occupation"); *Rizzo v. Paul Revere Ins. Group*, 925 F.Supp. 302 (D.N.J.1996), *aff'd*, 111 F.3d 127 (3d Cir.1997) (both treating physician and independent medical examiner concluded claimant could return to work as a "truck driver" and claimant's contention that he was a "beer truck driver"—which required heavy lifting—as "too narrow a definition" of his occupation). And the language in the plan required a stronger showing by plaintiff in *Taterka v. Nationwide Mut. Ins. Co.*, 91 A.D.2d 568, 457 N.Y.S.2d 53 (1st Dep't. 1982) (claimant entitled to benefits only if an injury or illness shall wholly and continuously disable the insured so as to prevent him from performing *any and every duty* of his occupation, and claimant continued to be fully employed in his occupation performing activities "similar to those which he performed prior to the onset of his medical problems.")(emphasis added).

■ Peterson submitted unrebutted evidence to CNA, in the form of statements of his prior supervisor, Antonellis, and other colleagues who had worked with him at remote venue locations for CBS, that venue production managers are, in essence, required to do whatever is necessary to "get the show on the air." The evidence showed that other venue managers spent 30% of their time doing physical tasks (Drankoski Stmt. R.83–84), and Peterson himself stated that physical activities took up 50% of his time on the job. Peterson also submitted newspaper clippings and internal messages about specific instances where he had performed significant physical tasks (putting out a fire, sitting on a leaky roof during a rain storm,[4] and plowing snow)(RR.100–102). These examples illustrated and further supported what his co-workers had described to CNA as what venue production managers do to "get the show on the air."

CBS' "evidence," on the other hand, consisted in essence of Toohey's "clarification" of his PDA analysis, which does not clarify, but rather contradicts, the PDA itself. CNA accepted Toohey's conclusory "clarification" and rejected completely the actual evidence—including evidence that CBS had reacted to Plaintiff's injury by "Taking

---

4. Peterson sat on a leaky roof so that CBS' "talent" would not get wet. *See* "The TV Column," *Washington Post*, Dec. 14, 1987. On another occasion, he put out a fire above CBS correspondent Bob Schieffer's head. *See* "The TV Column," *Washington Post*, Feb. 2, 1990.

him off Nagano"—without stating a basis for its conclusions. CNA never analyzed or made any determination of which duties of a venue production manager were "substantial and material" to the job. Rather, it accepted CBS' assertion that Peterson's job did not require him to engage *any* strenuous physical tasks, that physical tasks could be delegated to other employees at site, and that, therefore, physical tasks that he might have performed in the past were not "substantial and material duties" of his job. Accepting that conclusion was erroneous as a matter of law.

It is undisputed on the record before me that strenuous physical activities took up some amount of time of Peterson's regular occupation as a venue production manager. It is also undisputed that, upon learning of Peterson's disability, CBS flew Peterson back from his venue and assigned him to a sedentary desk job (a job which both sides agree was not the job of venue production manager) Furthermore, there is no evidence in the record that CBS, at any time after September, 1997, asked Peterson to return to Japan, or reinstated any of his previous occupational duties—not even the supervisory and coordinating responsibilities that, according to Toohey, involved no significant physical demands. The only reasonable conclusion one can draw from CBS' action, is that Peterson's physical limitations made him unable to continue to work as a venue production manager, or at least to carry out the duties of the job that made him useful as a supervisor at the "venue." Having so concluded, it would be manifestly unreasonable to determine—as CNA did—that strenuous physical activity was not "substantial and material" to Peterson's work as a supervisor at the venue. If it was not "substantial and material," an accommodation away from the venue site that took away his supervisory responsibilities would not have been necessary.

The administrative record supports only one conclusion: that some strenuous physical activity was "substantial and material" to Peterson's duties as a venue production manager. Applying the *de novo* standard to the STD determination, I hold that

CNA's denial failed to give the Plan terms their plain meaning and failed to show that Peterson's interpretation of "substantial and material" was unreasonable, or that CNA's interpretation was the only one that could fairly be placed on the terms. Applying the arbitrary and capricious standard to the LTD Plan I hold that CNA's determination of the "substantial and material duties" was erroneous as a matter of law, and cannot be upheld.

This finding does not require me to resolve the more precise question of whether strenuous physical activity took up 30%, 50% or some lesser percentage of Peterson's time. The record is clear that, without the ability to perform whatever physical tasks need to be done at the venue, a venue production manager cannot "get the show on the air." CBS as much conceded this fact when it transferred Peterson back to New York.

### (2) *The Medical Evidence*

▪ Plaintiff contends that, in reviewing his medical history, CNA unreasonably ignored the evidence of his severe back problems, evidenced in the results of his Feb. 17, 1998 MRI showing spinal cord impingement at the C3–4 and C4–5 levels (a finding reached independently by Dr. Barrett, Peterson's treating neurologist, after reviewing the MRI film itself), and also ignored the severity of his carpal tunnel problems, as evidenced in his June 12 and July 25, 1998 EMGs (showing severe carpal tunnel neuropathy). With regard to Peterson's spinal condition, CNA instead based its assessment solely on impressions developed several months earlier, in October and November 1997 (by Drs. Lavyne and Petito, respectively), that his cervical spondylosis, at that time, was mild and was not causing any spinal compression. (RR.31.) Dr. Oppenheim, who CNA retained to review Peterson's records and issue and opinions to his disability, did not have either the MRI film or the report in his possession when he prepared his report.

First, there is no evidence that the MRI findings were ever reviewed by CNA's own medical expert, who concluded that Peterson's back problems were non-disabling. In the face of contrary submissions made by Peterson's treating physicians, who are qualified experts, the Claim Administrator's opinion that the MRI does not alter CNA's finding is therefore unreasonable. *See Maida v. Life Ins. Co. of N. America,* 949 F.Supp. 1087, 1092–93 (S.D.N.Y.1997) (rejecting the opinion of a qualified medical expert and relying, instead, on the conclusions of an unqualified benefit analyst is arbitrary and capricious.)

■ Second, CNA unreasonably disregarded evidence of Peterson's severe carpal tunnel problems, both at the time of his claim and continuing through to the present, which were documented through the EMG studies and have necessitated multiple surgeries and ongoing prescription pain-killers. CNA's basis for playing down Peterson's carpal tunnel appears based on CNA's attempt to resurrect the argument—rejected by this Court in the clearest language possible—that Peterson's position as a venue manager was "accommodated" after September, 1997 (RR.31), and its conclusion that his carpal tunnel syndrome would not have been disabling "allotting for the normal recovery periods associated with open carpal tunnel release (42 days) per surgery." (*Id.*)

CNA's conclusion about Peterson's carpal tunnel fails to account for the complete nerve blockage at the time of his claim, documented by the EMGs taken in June and July of 1998, which CNA concedes was not "corrected" by surgery until December 1998. (Defs. 56.1 stmt. ¶ 46.) At a minimum, this admission contradicts CNA's own finding that Peterson was ineligible for short-term disability after March 15, 1998. Further, the contentions of CNA's claim administrator about the normal recovery from carpal tunnel surgery is unreliable—given her lack of medical qualification and lack of evidence in the record— and was also irrelevant to the question before CNA, i.e., whether *Peterson's* car-

pal tunnel syndrome was severe and resistant to correction. The evidence submitted by Peterson's doctors indicated that his carpal tunnel problems were severe and resistant to correction. (Pls. 56.1 stmt. at ¶ 15.) Absent contrary evidence, CNA's conclusion that Peterson's problem would not have prevented him from performing the "substantial and material duties" of his profession even after December 1998 is arbitrary and capricious and unsupported by the record.

Of course, CNA's conclusions about Peterson's disability were based on its erroneous determination of what constituted the "substantial and material duties" of his job. Thankfully, however, this Court need not remand this issue of Peterson's physical limitations to CNA for further determination, because CNA's own expert (Dr. Oppenheim)—even without the benefit of the MRI and EMGs—concluded that Peterson should not engage in "extended periods of repetitive hand movements" or "heavy lifting." (Oppenheim Opinion, R.67–68.) That conclusion is enough to find that Peterson was disabled from a job in which heavy lifting and other strenuous physical activity was a "substantial and material duty." The job of venue production manager is such a job.

(3) *Peterson's Prospects for Gainful Employment in an "Occupation for Which He is Qualified by Education, Training, or Experience."*

■ Despite a specific direction by this Court that it do so, CNA failed to address whether Peterson is "qualified by training, education and experience for any occupation" other than venue production manager, which is a requirement under the Plan after a claimant receives 24 months of LTD benefits. CNA's failure to make a finding on this issue, when it was specifically directed to do so and when Plaintiff had submitted evidence addressing the issue, is manifestly unreasonable. This Court will therefore make the determina-

tion based on the record that was before CNA.

Courts have determined that the "reasonably fitted by training, education or experience" language contained in the Plan requires the claim administrator to demonstrate the existence of a job which the claimant is capable of, and qualified to, perform and which is comparable in terms of remuneration. *See Mossa v. Provident Life and Cas. Ins. Co.*, 36 F.Supp.2d 524, 531 (E.D.N.Y.1999). Peterson submitted to CNA evidence of a career that evolved (with the exception of his stint in the Army) almost exclusively from on-the-job training at CBS—starting in the mail room—one that for many years, and at substantial pay, was devoted to the specialized occupation of a venue production manager. Given his specialized training, lack of a formal education beyond high school, and physical limitations, it is unlikely that Peterson would have been able to obtain employment with a reasonably comparable salary in a sedentary position.

Because the denial of Peterson's benefits claims under both plans was arbitrary and capricious, this Court need not remand the claim back to the Claim Administrator. *See Zuckerbrod v. Phoenix Mut. Life Ins. Co.*, 78 F.3d 46, 51 n. 4 (2d Cir.1996) (remand not required "where the difficulty [in the claim administrator's decision] is not that the administrative record was incomplete, but that the denial of benefits based on the record was unreasonable.")

I therefore hold that Peterson has demonstrated that he, more likely than not, was "totally disabled" within the meaning of the STD Plan, and that any contrary determination reached by CNA was arbitrary and capricious. Further, I find that there is no substantial evidence in the record to support CNA's conclusion that Peterson's occupation was sedentary or that he could perform the substantial and material duties of his non-sedentary job as venue production manager, and thus no substantial evidence supporting denial of his LTD benefits. There is no qualified expert opinion contravening the full medical evidence from Peterson's treating doctors documenting his physical incapacities. Nor is there any evidence, nor any claim by CNA, that Peterson has been gainfully employed in another reasonably comparable occupation.

Having met the criteria of the STD and LTD Plans, Peterson is entitled to the benefits he claims.

## CONCLUSION

Defendant's motion for summary judgment is denied. Plaintiff's cross-motion for summary judgment is granted. Plaintiff should submit a proposed order for costs and reasonable attorneys fees within 30 days of this order for review by the Court.

This constitutes the decision and order of this Court.