995 F.2d 1433
 62 USLW 2016, 16 Employee Benefits Cas. 2361,
Pens. Plan Guide P 23879C
 Donald BRUMM, Appellant,
v.
BERT BELL NFL RETIREMENT PLAN, William V. Bidwell, Michael
Lynn, James Kensil, Thomas Condon, Daniel Jiggets,
Edward Garvey, Sarah Meizlik, Plan
Administrator, Appellees.
 No. 92-3346.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 14, 1993.
Decided June 16, 1993.
Rehearing and Suggestion for Rehearing
En Banc Denied
Sept. 14, 1993.
 
 Helmut Starr, St. Louis, MO, argued, for appellant.
 Richard Ralston, Kansas City, MO, argued (Dennis J. Dobbels and Diane P. Duvall, on the brief), for appellees.
 Before WOLLMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.
 MORRIS SHEPPARD ARNOLD, Circuit Judge.
 
 
 1
 Donald Brumm, a vested participant in the Bert Bell NFL Retirement Plan (Plan), applied for disability benefits under the Plan, which is governed by ERISA, 29 U.S.C. § 1001 et seq. Throughout a number of proceedings between 1984 and 1987, the Plan's retirement board (Board) denied Brumm the full disability benefits that he sought. Brumm then sued the Plan and Board members under 29 U.S.C. § 1132(a)(1). This appeal arises from the district court's grant of the Plan's summary judgment motion, 802 F.Supp. 258. We reverse.
 
 I.
 
 2
 Brumm played football for two different NFL teams between 1963 and 1972. He sustained a number of injuries to his back and knees during his NFL career, and he suffers from traumatic spondylolisthesis (forward displacement of one vertebrae over another) between the second and third vertebrae of his back.
 
 
 3
 After his football career, Brumm worked as a truck driver until October, 1977, when he was involved in a truck accident and suffered a back injury. A physician's notes, recorded at the time of the post-accident examination, indicate that Brumm was suffering a "pre-existing spondylolisthesis between L2 and L3" with "some degenerative changes between this area indicating that this spondylolisthesis was old." The doctor noted that the "injury occurred during [Brumm's] occupation as a professional athlete." Following the accident, Brumm worked as a dispatcher for the trucking company, then as a surveyor, and finally as owner/manager of a fast-food restaurant. Brumm has been unemployed since December, 1984, and says he is unable to work because he suffers constant back pain.
 
 
 4
 Brumm applied for Plan benefits in November, 1984. Under Section 5.2 of the Plan, a participant is "totally and permanently disabled" if he "has become totally disabled to the extent that he is prevented from or unable to engage in any occupation or employment for remuneration or profit...." Section 5.1 of the Plan provides for two levels of total and permanent disability payments: a player is eligible for "Level 1 T & P" benefits if "totally and permanently disabled" due to "a football injury incurred while an Active Player"; he receives "Level 2 T & P" benefits if his "total and permanent disability results from other than a football injury." The phrase "a football injury incurred while an Active Player" is not defined.
 
 
 5
 Pursuant to his application for benefits, Brumm was examined by a Dr. Darnell, a Plan-selected physician. Although there is some confusion as to Dr. Darnell's assessment of Brumm's disability, he indicated on a Plan document that Brumm was neither "totally disabled" nor "unable to engage in any occupation for any remuneration or profit." In April, 1985, the Board considered Brumm's application for disability benefits and, looking only at Dr. Darnell's report, denied Brumm's disability claim because it determined that he was not "totally and permanently disabled" under Section 5.2. A notice-of-denial letter sent to Brumm in May, 1985 confirmed that the Board's decision was based on Section 5.2, i.e., that Brumm was not totally and permanently disabled.
 
 
 6
 Brumm's attorney subsequently filed a timely request for reconsideration of the Board's decision, providing supplemental medical and psychiatric evidence tending to prove Brumm's disability. The Board denied Brumm's request in June, 1985. Almost a year passed without further activity on the claim. In May, 1986, Brumm's attorney provided the Plan with still more evidence to support Brumm's claim, including evidence of a December, 1985, grant of Social Security benefits based on Brumm's inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." After tabling Brumm's appeal several times, the Board finally sent Brumm to a neutral psychiatrist. After several examinations, the psychiatrist signed a Plan form indicating that Brumm was disabled from engaging "in any occupation for remuneration or profit." He concluded that Brumm was permanently disabled from a combination of depressive disorder and back pain and that his disability resulted from an injury caused by "a football-related activity." Board trustees finally voted on Brumm's claim by mail ballot in early January, 1987, and Brumm was notified on January 21, 1987, that he was being granted Level 2 benefits for four months with continuation dependent on consideration of his claim at the March meeting. The letter did not state the basis of the decision, but the Board evidently considered Brumm to be totally and permanently disabled within the meaning of Section 5.2, and the issue became the proper level of benefits to which Brumm was entitled under Section 5.1.
 
 
 7
 On January 28, 1987, the Plan received an arbitrator's opinions and decisions on a separate matter involving seven players whose claims for Level 1 benefits had been submitted to arbitration. The arbitrator, Sam Kagel, concluded that a player would be eligible for Level 1 T & P ("football") benefits (1) if the player incurred his disability from one identifiable football injury and (2) if he became totally and permanently disabled within a reasonable time after leaving football. Other totally and permanently disabled participants would receive Level 2 ("non-football") benefits. Brumm was not a party to this arbitration.
 
 
 8
 In March, 1987, the Board voted to continue Brumm's Level 2 benefits, but it tabled his request for Level 1 benefits and an earlier onset date. At a May, 1987, meeting the Board summarily denied Brumm's request for Level 1 and an earlier onset date. On June 24, 1987, a Plan administrator sent Brumm a letter informing him that the Board had denied his request for reclassification. The letter referred to Section 5.1 as the basis for the denial. Although no other reason was stated for the denial, an internal Plan document indicates that the Board relied on the standards established in the Kagel arbitration.[1] In upholding the Board's decision, the district court opined that the Board denied Brumm Level 1 benefits because his disability did not "stem from 'a' football injury" under Section 5.1. Brumm continues to receive Level 2 disability benefits.
 
 
 9
 Brumm raises several issues on appeal. In our discussion of the proper standard of review and in the context of our assessment of the Board's decision under that standard, we discuss several of Brumm's arguments. We reverse based on our finding that the Board's presumed interpretation of Section 5.1 was unreasonable and constituted an arbitrary and capricious denial of benefits.
 
 II.
 
 10
 We note at the outset that our analysis is somewhat complicated by the Board's failure to provide Brumm with adequate notice regarding its denial of Level 1 benefits. The June, 1987, notice letter stated that he was denied Level 1 benefits "because [Brumm] did not meet the requirements of Section 5.1 of the Plan ..., the disability results from a football injury incurred while an Active Player'." This notice is inadequate under the ERISA statutory scheme which requires that every Plan shall provide "adequate notice in writing to any participant or beneficiary that his claim for benefits under the Plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by any participant." 29 U.S.C. § 1133. In Richardson v. Central States Southeast & Southwest Areas Pension Fund, 645 F.2d 660 (8th Cir.1981), we held that Plan trustees are "obligated to briefly state the facts of the case and the rationale for their decision [because doing so] build[s] a body of precedent that will ultimately bring about a form of consistency otherwise lacking in the administration of the Fund." Id. at 664. We stated that "[b]ald-faced conclusions do not satisfy the requirement." Id. at 665. The June, 1987, notice denying Brumm's request for reclassification was inadequate under Section 1133 and Richardson because it did not state what construction the Board was placing on the Plan language and what element required for recovery Brumm failed to prove.
 
 
 11
 While the Plan's brief is generally silent regarding the basis for its decision to grant Brumm only Level 2 benefits and the influence of the Kagel arbitration, the Board notes that the Kagel arbitration distinction between Level 1 and Level 2 benefits supported its decision to grant Brumm "non-football" benefits and gave the Board no cause to alter the level of benefits when it reconsidered the matter in March, 1987. During oral arguments the Plan's attorney "surmise[d]" that the Plan had relied on the Kagel arbitration in deciding Brumm's claim. He stated, however, that he could not confirm "definitively" that the Plan temporarily granted Brumm Level 2 benefits in January, 1987 with a view toward reviewing his claim in light of the Kagel arbitration after the decision was final. Based on the temporal proximity of the Kagel arbitration to the early 1987 decisions on Brumm's claim, the internal document indicating the influence of the Kagel arbitration in the disposition of Brumm's claim, and the Board's own comments, we find that the Board was influenced by the Kagel criteria for differentiating between Level 1 and Level 2 benefits and may have applied both in granting Brumm the lower level of benefits. We analyze the case, however, as though the Board applied only the first criterion (single, identifiable football injury), because we find imposition of this criterion to be unreasonable.
 
 
 12
 The Board has not refuted the district court's assumption that the Board interpreted Section 5.1 in this manner. Nor has the Board offered an alternative interpretation of Section 5.1 as justification for denying Brumm Level 1 benefits. The Board might, for example, have maintained that it interpreted Section 5.1 to require that, in order to receive Level 1 benefits, a player must show that but for his football injury or injuries, he would not have been disabled. We might well have upheld such an interpretation as reasonable, but the Board does not argue that it construed Section 5.1 in this manner. We therefore need not consider this or any other interpretation that might be reasonable.
 
 III.
 
 13
 The Supreme Court has held that, based on principles of the law of trusts, a denial of benefits challenged under § 1132(a)(1)(B) must be reviewed "under a de novo standard unless the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan", in which case a decision is reversed only if it was arbitrary and capricious. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); see also Cox v. Mid-America Dairymen, Inc., 965 F.2d 569, 571 (8th Cir.1992). The Plan at issue here gives the Board discretionary power "[t]o define and amend the terms of the Plan and Trust, to construe the Plan and Trust and to reconcile inconsistencies therein." Section 8.4. The Plan further provides that "[w]henever in this Plan and Trust discretionary powers are given to the Board, it shall have the broadest discretion permitted under [ERISA], and its decision shall, to the extent permitted by [ERISA], be binding upon all persons affected thereby." Section 8.13. The Board may not, however, "[r]educe, as a direct result of an amendment, the value of any benefit already earned and otherwise payable under the Plan". Section 8.5. See 29 U.S.C. § 1054(g) (ERISA's anti-cutback provision). The Board's discretionary power under the Plan has been confirmed by two courts. Bidwill v. Garvey, 943 F.2d 498, 505 (4th Cir.1991); Cleveland Franklin v. Bert Bell NFL Player Retirement Plan, Case No. MJG-88-3785, 1992 WL 515867 (D.Md. Feb. 21, 1992).
 
 
 14
 Under the appropriate standard of review, we uphold the Board's construction of Section 5.1 if it is a reasonable one. Finley v. Special Agents Mut. Benefits Ass'n, 957 F.2d 617, 621 (8th Cir.1992), (citing Firestone v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); De Nobel v. Vitro Corp., 885 F.2d 1180, 1188 (4th Cir.1989) (citations omitted)). In Finley, we enumerated certain matters to be considered in determining the reasonableness of a Board's interpretation of a Plan: (1) whether the interpretation is consistent with the Plan's goals; (2) whether the interpretation renders any Plan language meaningless or internally inconsistent; (3) whether the interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the Board has consistently interpreted the words at issue; (5) whether the interpretation is contrary to the clear language of the Plan. Finley, 957 F.2d at 621. After discussing each of these matters in the context of the Board's presumed interpretation of Section 5.1, the district court found it reasonable and therefore not arbitrary and capricious. We disagree.
 
 
 15
 The Section 5.1 language at issue here has not changed since 1979. The two-tier system was established in 1977 after three years of collective bargaining on the issue. It is not surprising that the players and the owners disagree as to the intended meaning of the key language differentiating Level 1 from Level 2, because, in the negotiations leading up to adoption of the relevant language, each side's proposals were repeatedly rejected by the other. The players proposed a two-tier system that was truly "football" versus "non-football", just as Brumm proposes the scheme should be interpreted: Level 1 benefits would be awarded for disability related to football, and Level 2 benefits would be awarded for disability resultant from any non-football incident or illness, i.e., if a "player had a heart attack or was hit by a car". The owners, on the other hand, proposed that the higher level of benefits should be awarded only if the injury caused the player to be totally and permanently disabled at the time of the injury. Even given the historical context in which the two-tier system evolved and was adopted, it is impossible in light of conflicting accounts to say with any certainty precisely what the parties finally agreed to as the appropriate distinction between Level 1 and Level 2 benefits. (It is as if, given their inability reach a consensus on the proper differentiation between the two levels of benefits, the parties purposefully adopted this ambiguous language, for which each side could claim victory and then hope for the best when the Board was construing it in a given case.) In January, 1979, the Board adopted a resolution that would provide for an award of the higher level of benefits "only in favor of Players who suffer football related injury as distinguished from a non-football injury or illness." This resolution seems to us to be closer to the players' position than that of the owners because it appears to endorse a "football" versus "non-football" basis for differentiation between the benefit levels.
 
 
 16
 Applying Finley, we examine first the goals of the Plan. While the district court held that the Board's construction of Section 5.1 was consistent with the Plan's goal to "provide disability benefits for former football players", the opinion offers no indication as to how the court divined this goal, one which, whether actually a goal or not, provides no real insight into the proper interpretation of Section 5.1. The district court went on to discuss the three types of benefits provided by the Plan and observed that if Section 5.1 were given Brumm's proposed construction, "Level 2 T & P benefits [would be] almost unnecessary" because "[a]lmost every claimant would qualify for Level 1 T & P benefits." The district court considered reasonable the Board's differentiation "between those whose disability can be traced to a single injury and those whose disability is the result of a football career's overall impact on the body, making the body more susceptible to injury later in life."
 
 
 17
 We are not convinced by this reasoning. First, we do not believe that Brumm's proposed construction would render Level 2 benefits obsolete. Such benefits would still be awarded to former football players who became disabled as a result of any of a great variety of non-football illnesses or incidents. Second, we simply disagree with the pronouncement of reasonableness of the differentiation between a single football injury and one resulting from a football career's overall impact on the body when the history of negotiation over 5.1, while admittedly inconclusive, tends to indicate a football versus non-football distinction instead. It is certainly more reasonable to differentiate between football injuries and non-football injuries, as the language of Section 5.1 appears, at first glance, to do.
 
 
 18
 If the Plan's goal is to take care of the players as part of their compensation for investing themselves in the sport, players who suffer a series of football injuries resulting in disability are as entitled to consideration as those suffering a single disabling injury. Besides, the Board's construction of the benefits scheme seems inconsistent with Plan goals to the extent that we assume the Plan sought to meet the reasonable expectations of Plan participants familiar with the type and prevalence of cumulative injuries incurred by those in their profession, as well as the reasonable expectations of those reading a plan whose benefits scheme appears simply to differentiate between football and non-football disability. The considerable difference between the dollar value of benefits paid to Level 1 recipients ($4000/month) and Level 2 recipients ($750/month) also undermines the district court's support of the Board's scheme. For a player who suffers a single football injury to receive more than five times the amount of a player who suffers a cumulative football injury strikes us as more than a little odd. If, on the other hand, a true football versus non-football distinction is represented by the two-tier scheme, those standing to receive only Level 2 benefits would receive some support from their participation in the Plan, but considerably less than if the disability was a result of their contribution to the sport. We are unconvinced that the Board's interpretation of Section 5.1 is consistent with Plan goals.
 
 
 19
 Under Finley we next consider whether the Board's interpretation renders any Plan language redundant or internally inconsistent. We cannot say that it does.
 
 
 20
 Thirdly, we ask whether the Plan's interpretation meets the substantive and procedural requirements of ERISA. We conclude that the Plan failed to meet the ERISA requirement that the Summary Plan Description be sufficiently accurate and comprehensive. The ERISA statutory scheme mandates that a plan description "shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1). Subsection b of that section further provides that the eligibility requirements for participation and benefits shall be included in any summary plan description of the full plan. The description must not mislead, misinform, or fail to inform participants and beneficiaries of the requirements of the full plan. See Genter v. Acme Scale & Supply Co., 776 F.2d 1180, 1185 (3rd Cir.1985). The district court found that the summary description of the NFL Plan complied with these standards. We disagree.
 
 
 21
 Because the summary plan description, as well as the Plan itself, is silent as to the meaning of "a football injury incurred while an Active Player", it fails to inform participants that this means a single, identifiable injury. As noted above, at first blush the Section 5.1 language, quoted in the summary plan description, appears to draw a football versus non-football distinction. A participant--particularly one without knowledge of the history of conflict over this issue--will surely assume that this is the basis of differentiation between Level 1 and Level 2 benefits. It is hard to imagine a participant who, after reading the language in both the Plan and the summary plan description, would assume that a single, identifiable football injury was necessary in order to qualify for the higher level of benefits. Language stating that a disability resulting from more than one football injury makes a participant ineligible for the highest level of benefits would have been adequate to apprise participants of this limitation and should have been included in the summary. The case for inclusion of such an explicit statement is strengthened when one considers that the single-injury limitation, now sanctioned by the Kagel arbitration, will likely be commonly invoked to deny benefits to career football players who suffer numerous and cumulative disabling injuries over the course of their careers. The summary plan description for the Bert Bell NFL Retirement Plan does not comply with ERISA.
 
 
 22
 The fourth Finley consideration is whether the Board has, in the past, interpreted the section at issue consistently with the construction under consideration. It appears that Section 5.1 has not always been interpreted to require a single, identifiable football injury. Indeed, because the Board trustees' deadlock regarding the proper interpretation of Section 5.1 led to the Kagel arbitration, we know that this criterion was not imposed consistently prior to that time. While disability claims are difficult to compare, we note that some Plan participants who have been granted Level 1 football benefits, including William Wayne Frazier, Charles Warner, and Otis Armstrong, suffered more than one football injury. That is, each suffered what is considered to be a sort of primary injury, subsequently returned to football, and eventually was re-injured and had to leave the sport. Thus, while each can identify a primary injury, each cannot truly say that he suffered a single disabling injury. These inconsistencies undermine the purported reasonableness of the Board's current construction that requires a single, identifiable football injury.
 
 
 23
 Most compelling, perhaps, in this case is our analysis under the final Finley consideration: Whether the Plan interpretation is contrary to the Plan's clear language. We conclude that the interpretation applied in Brumm's case, if not flatly contrary to the language of the Plan, represents at the least a startling construction. To require that disability result from a single, identifiable football injury when the relevant Plan language speaks of "a football injury incurred while an Active player" is to place undue and inappropriate emphasis on the word "a". "Injury" can mean either an "act or a result involving an impairment or destruction of ... health" Webster's Third New International Dictionary (1986). Therefore, the key phrase from Section 5.1, "a football injury", could refer to either a single injury (act) or a cumulative one (result). The apparent dichotomy set up by Section 5.1--between "results from a football injury" and "results from other than a football injury"--is consistent with the latter meaning. In sum, we believe that the Board's proposed construction of the relevant language impermissibly crossed the line between interpretation and amendment.
 
 
 24
 Having considered it in light of the criteria set out in Finley, we conclude that the Board's construction of Section 5.1 is unreasonable. We therefore find that the Board arbitrarily and capriciously denied Brumm Level 1 benefits.
 
 IV.
 
 25
 We therefore reverse and remand to the district court with instructions to compute and award benefits consistent with this opinion.
 
 
 
 [1]
 A telephone conversation record dated 8/21/87 stated:
 Admin note: Now the attorney is appealing BOTH denial requests again: If turned down [on] T & P football again, I think [co-counsel] should phrase more explicit description of why denied--truck accident, etc. & doesn't meet Kagel's T & P arbitration opinion (7 dwarfs). Also, Board should carefully consider the SS Judge Mills decision (re Earlier date) and fact that he 1st visited [Dr.] Darnell in '84.
 Joint Appendix at 100250 (emphasis original).