**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VICTOR A. WASHINGTON,
　　　　　　*Plaintiff-Appellee,*

v.

BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN;
RETIREMENT BOARD OF THE BERT
BELL/PETE ROZELLE NFL PLAYER
RETIREMENT PLAN; NFL PLAYER
SUPPLEMENTAL DISABILITY PLAN;
DISABILITY BOARD OF THE NFL
PLAYER SUPPLEMENTAL DISABILITY
PLAN,
　　　　　　*Defendants-Appellants.*

No. 05-16366

D.C. No.
CV-04-00360-NVW

VICTOR A. WASHINGTON,
　　　　　　*Plaintiff-Appellant,*

v.

BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN;
RETIREMENT BOARD OF THE BERT
BELL/PETE ROZELLE NFL PLAYER
RETIREMENT PLAN; NFL PLAYER
SUPPLEMENTAL DISABILITY PLAN;
DISABILITY BOARD OF THE NFL
PLAYER SUPPLEMENTAL DISABILITY
PLAN,
　　　　　　*Defendants-Appellees.*

No. 05-16533

D.C. No.
CV-04-00360-NVW

12927

VICTOR A. WASHINGTON,
                *Plaintiff-Appellee,*

          v.

BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN;
RETIREMENT BOARD OF THE BERT
BELL/PETE ROZELLE NFL PLAYER
RETIREMENT PLAN; NFL PLAYER
SUPPLEMENTAL DISABILITY PLAN;
DISABILITY BOARD OF THE NFL
PLAYER SUPPLEMENTAL DISABILITY
PLAN,
                *Defendants-Appellants.*

No. 05-16845

D.C. No.
CV-04-00360-NVW

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
July 11, 2007—San Francisco, California

Filed September 21, 2007

Before: Procter Hug, Jr., Pamela Ann Rymer, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Rymer;
Partial Concurrence and Partial Dissent by Judge Fisher

## COUNSEL

Edward A. Scallet, Groom Law Group, Washington, DC, for the appellants.

Susan Martin, Martin & Bonnett, Phoenix, Arizona, for the appellee.

## OPINION

RYMER, Circuit Judge:

Victor A. Washington is a former player in the National Football League. He was a participant in the Bert Bell NFL Player Retirement Plan (the old Plan) until it was amended and merged with the Pete Rozelle NFL Player Retirement Plan on March 30, 1994 to become the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the new Plan). He is now a participant in the Bell/Rozelle Plan. Both Plans are governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq.*, and administered by a six-member Retirement Board (Board).

Unfortunately, Washington's professional career was plagued by injuries. He was a running back and kick returner who began playing in the NFL in 1971. He came over from the Canadian Football League having already suffered a knee injury that required surgery. While playing in the NFL, he hurt his ankle, cracked his knee cap, and underwent surgery on his left shoulder and elbow. Washington left football in 1976.

His claims history started in 1983 and is extensive. Greatly simplifying it, a player must be totally and permanently disabled.[1] Since leaving the NFL, Washington has suffered post-traumatic stress disorder and depression. He has sometimes worked, sometimes not. Medical opinions have differed as to whether he was totally disabled or could perform some type of work.

Washington's first claim was made in 1983 for total and permanent disability benefits under the *old* Plan. The old Plan classified temporary and permanent disability benefits as "football" or "non-football." "Football" benefits were paid where the disability resulted from "a football injury." Benefits at the "football" level were greater than for "non-football" disabilities.[2] The Board (three of whom are appointed by the National Football League Players Association and three by the NFL Management Council) deadlocked on Washington's 1983 claim, and referred the issues of total and permanent disability, as well as the cause of disability, to arbitration. On July 10, 1987 the arbitrator, Sam Kagel, awarded Washington "non-football" benefits (as of August 1, 1984), but denied "football" benefits based on the arbitrator's interpretation of the phrase, "a football injury," as requiring that a player's disability be linked to *a* single football injury. The arbitrator found that Washington's medical experts had not pointed "to

---

[1]The new Plan deems a player "to be totally and permanently disabled if the Retirement Board . . . finds that he has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit." Plan, § 5.2. The old plan defined the phrase similarly.

[2]Under the old Plan, § 5.1 as amended through March 8, 1983 provided:

Effective January 1, 1983, the monthly pension shall be no less than $4,000 if the disability results from a football injury incurred while an Active Player.

Effective January 1, 1983, the monthly pension shall be no less than $750 if the total and permanent disability results from other than a football injury.

'a injury' that resulted in his having to leave football" and the psychiatrists had not identified " 'a' injury as solely responsible for Washington's psychological problems." Washington did not litigate the issue further.

In the same time frame, Kagel decided a series of cases involving other former NFL players in which he applied essentially the same criteria that included, in particular, his view that a player would be eligible for "football" benefits under the old Plan only if he incurred his disability from a single football injury. The Board, in turn, relied on the Kagel criterion of one identifiable football injury in denying Donald Brumm's request for "football" benefits in May, 1987. Brumm took his case to federal court. It ended up in the Eighth Circuit Court of Appeals, which, on June 16, 1993, rejected as unreasonable the same interpretation of the phrase, "a football injury," in the old Plan that the arbitrator had applied to Washington's 1983 claim. *Brumm v. Burt Bell NFL Ret. Plan*, 995 F.2d 1433 (8th Cir. 1993). The opinion recites the course of negotiations between the players and owners that produced the two-tier "football"/"non-football" system in the old Plan. *See id.* at 1438. The court agreed with Brumm that this system was meant to be a football versus non-football distinction rather than the single injury versus multiple or cumulative injury construction adopted by Kagel and the Board. Thus, the court concluded:

> To require that disability result from a single, identifiable football injury when the relevant Plan language speaks of "a football injury incurred while an Active player" is to place undue and inappropriate emphasis on the word "a". "Injury" can mean either an "act or a result involving an impairment or destruction of . . . health". Therefore, the key phrase from Section 5.1, "a football injury", could refer to either a single injury (act) or a cumulative one (result).

*Brumm*, 995 F.2d at 1440 (internal citation omitted).

After *Brumm*, the NFL Management Council and the NFL Players Association agreed on the new Plan as part of a new collective bargaining agreement. The new Plan, of which Washington was notified December 20, 1993 and which became effective as of July 1993, eliminated the "football" and "non-football" categories of total and permanent disability benefits under the old Plan, replacing them with four new categories: Active Football, Active Nonfootball, Football Degenerative, and Inactive.[3] Football Degenerative benefits are paid where the total and permanent disability arises out of "League football activities" and Inactive benefits are paid

---

[3]Section 5.1 sets out the categories as follows:

(a) (Active Football). The monthly total and permanent disability benefit will be no less than $4,000 if the disability(ies) results from League football activities . . . .

(b) (Active Nonfootball). The monthly total and permanent disability benefit will be no less than $4,000 if the disabilty(ies) does not result from League football activities, but does arise while the Player is an Active Player . . . .

(c) (Football Degenerative). The monthly total and permanent disability benefit will be no less than $4,000 if the disability(ies) arises out of League football activities, and results in total and permanent disability before the later of (1) age 45, or (2) 12 years after the end of the Player's last Credited Season.

(d) (Inactive). The monthly total and permanent disability benefit will be no less than $1,500 if (1) the total and permanent disability arises from other than League football activities while the Player is a Vested Inactive Player, or (2) the disability(ies) arises out of League football activities, and results in total and permanent disability after the later of (i) age 45, or (ii) 12 years after the end of the Player's last Credited Season.

Players who qualify for Football Degenerative benefits receive both a monthly benefit and a monthly disability payment from the NFL Player Supplemental Disability Plan (Supplemental Plan) which was also established in the 1993 Collective Bargaining Agreement. Players who qualify for Inactive benefits do not receive additional amounts from the Supplemental Plan.

where the disability arises from "other than League football activities."[4] Washington's "non-football" benefits under the old Plan were treated as Inactive benefits under the new Plan, and were increased from $750 per month to $1,500 per month as of the Plan's effective date in July 1993.[5]

If eligible for benefits at the Football Degenerative level, Washington would have received no less than $4,000 monthly. On February 29, 1996 he requested reclassification of his new Plan benefits to Football Degenerative. The Board denied his request on April 18, 1996, advising Washington that it had determined that his "disability did not arise out of League football activities." Washington appealed, and retained an attorney with Spence, Moriarty & Schuster to represent him. New information was submitted, Washington was referred to a neutral psychiatrist whose report was favorable to his position, and a copy of the Supplemental Plan and its Summary Plan Description was sent to counsel.[6] Protracted

---

[4]Section 5.1 does not define "arises out of League football activities," but § 6.4(c), which pertains to line-of-duty disability, does. It provides:

"Arising out of League football activities" means a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities. "Arising out of League football activities" does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities.

[5]The December 20, 1993 notice also explained that as a result of the 1993 Collective Bargaining Agreement, due to benefit improvements Washington was eligible to receive a retroactive payment applicable to his effective date or April, 1987, whichever was earlier.

[6]The Supplemental Plan indicates that the Players Association and Management Council had considered the decision of the Eighth Circuit in *Brumm* in providing for supplemental disability benefits to players receiving Active Football, Active Nonfootball, or Football Degenerative benefits under § 5.1 of the new Plan.

negotiations resulted in a settlement agreement, executed December 8, 1998, which acknowledges that Washington asked the Board to reclassify his benefit from Inactive to Football Degenerative under section 5.1(c) of the new Plan, that the request was rejected, and that the parties "wish to resolve their dispute concerning classification of Mr. Washington's total and permanent disability benefit."[7] The resolution was for the Plan to pay Washington a substantial amount in a lump sum, for the Plan to continue to pay inactive benefits without requiring Washington to undergo periodic examinations, and for Washington to release the Plan from any claim for disability benefits.

When Washington turned 55 on March 23, 2001, his Inactive disability benefit converted to an equal retirement benefit under the new Plan. On October 3, 2001 Washington again requested that his disability benefits be reclassified at the Football Degenerative level. The Board responded that the settlement agreement released all claims for disability benefits, and that Washington had properly converted to retirement benefits at the Inactive rate pursuant to § 5.4 of the Plan.[8]

---

[7]The dissent posits that old Plan benefits were at stake, but Washington does not argue that benefits under the old Plan continued to be on the table, nor did his counsel or the district court understand that they were. Indeed, his attorney's declaration characterizes Washington's administrative appeal from the 1996 denial as a "claim to reclassify his disability from 'non-football related' to 'football degenerative' under the disability benefit terms of the Bert Bell/Pete Rozelle NFL Player Retirement Plan . . . .' " The court's ruling and order have to do only with the 1996 application. And Washington's 1992 round of claims pre-dated *Brumm*, so *Brumm* could have no relevance as to them. Nor does Washington argue on appeal that he could have pursued some kind of claim between 1992 and 1998 different from the one he actually made in 1996, or contend that the statute of limitations posed no problem with respect to that period or any period prior to 1992.

[8]Section 5.4 provides in relevant part:

If, as a result of the last physical examination prior to a Player's Normal Retirement Date, the Retirement Board or the Disability

Sometime in 2003, Washington learned about *Brumm* from another former NFL player. He then asked the Board for meeting minutes and relevant documents concerning his claims. The Plan furnished them in January 2004, together with a cost bill of $200.30.

Washington filed this action in 2004 against the Bell/Rozelle Plan and the Board[9] to undo the 1998 settlement under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), on the ground that the Plan and the Board breached their fiduciary duties by failing to disclose that the ruling in *Brumm* had overturned the criteria used to deny his football-related disability benefits. The district court concluded that knowing about *Brumm* would have made a difference to Washington in deciding whether to settle his 1996 claim, and thus should have been disclosed. For this reason it granted summary judgment to Washington, rescinded the settlement agreement, and reopened Washington's 1996 claim for reclassification.

The Plan and Board appeal. While a Plan fiduciary must disclose information that would be material to a reasonable participant, we disagree with the district court that the holding in *Brumm* would be material to a request for reclassification to Football Degenerative under the *new* Plan. *Brumm* concerned construction of the *old* Plan whose causation requirement for "football" benefits — disability resulting from "a football injury" — is different from the *new* Plan's require-

---

Initial Claims Committee determines that the Player continues to be totally and permanently disabled, he will be entitled to a monthly pension under Article 4, with his total and permanent disability benefit under Section 5.1(a), 5.1(b), 5.1(c), or 5.1(d), whichever previously applied, substituted for the sum of his Benefit Credits for life or until cessation of such total permanent disability . . . .

[9]Later, he added as parties the NFL Player Supplemental Disability Plan, and the Disability Board of the NFL Player Supplemental Disability Plan.

ment that Football Degenerative disability arise out of "League football activities." Nothing in the *Brumm* opinion sheds light on what *that* phrase means. Accordingly, we reverse the summary judgment. Washington cross-appeals, but we see no error on the issues he raises and affirm as to them.

I

Washington argues that a reasonable person would have wanted to know about the *Brumm* decision overturning the criteria the Board had previously used to deny him football-related benefits before agreeing to forfeit significantly higher benefits. He posits that *Brumm*'s holding would be important to deciding the likelihood of success on his appeal to the Board and the relative risks involved, as well as the risks of filing a lawsuit seeking benefits under ERISA. Thus, he submits, the failure to disclose was material and a breach of fiduciary duty.

[1] Rooted in trust law, *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989); *Peralta v. Hispanic Bus., Inc.*, 419 F.3d 1064, 1070 n.7 (9th Cir. 2005), ERISA imposes fiduciary duties on Plan administrators. The duty of loyalty is one of the common law trust principles that apply to ERISA fiduciaries, *see Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996), and it encompasses a duty to disclose.[10] Trustees must "deal fairly" and "communicate to the beneficiary all material facts the trustee knows or should know in connection with the transaction." *Peralta*, 419 F.3d at 1070 n.7 (quoting Restatement (Second) of Trusts § 170 (1992)); *see also Bins v. Exxon Co. U.S.A.*, 220 F.3d 1042, 1049 (9th Cir. 2000) (en banc) (employer-fiduciary violates its duty of loyalty "to plan par-

---

[10]By statute, an ERISA fiduciary is obliged to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1); *see also Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1045 (9th Cir. 2001).

ticipants by failing to disclose material information"); *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995) ("A fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even when a beneficiary has not specifically asked for the information."). The test is objective, as both parties recognize.[11] *Cf. United States v. Smith*, 155 F.3d 1051, 1065 (9th Cir. 1998) (noting that the test for materiality in a Rule 10b-5 case is "whether a reasonable man would attach importance (to the fact misrepresented) in determining his choice of action in the transaction in question") (internal quotations omitted); *see also Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999) (observing, in ERISA context, that "a misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing disability benefits to which she may be entitled"); *Fischer v. Phila. Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993) (same).

**[2]** We cannot see how the holding in *Brumm* would inform the decision-making process of a reasonable participant in Washington's position, pursuing a request to upgrade benefits from Inactive to Football Degenerative under the *new* Plan, contemplating settlement of such a request, or assessing the costs and benefits of litigating denial of that request. Washington reviewed the new Plan documents prior to settling his claim. The *new* Plan's Football Degenerative category provides for benefits of no less than $4,000 if disability "arises out of League football activities," while *Brumm* related entirely to the "football" category in the *old* Plan, which provided for benefits at that level for "a football injury." Wash-

---

[11]The district court's order turned on Washington's declaration that *he* would not have settled his claim for less than the full amount of football degenerative benefits through age 55 if he had known about the holding in *Brumm*. However, the court indicated in ruling on the Plan's motion for reconsideration that it would nevertheless reach the same conclusion had it applied a reasonable person standard.

ington was notified in 1987 that his claim for "football" benefits under the *old* Plan was rejected by the arbitrator because his medical experts had not identified "*a*" injury that resulted in his having to leave football and the psychiatrists had not identified "*a*" injury as solely responsible for Washington's psychological problems. By contrast, he was advised in 1996 that his request for reclassification under the *new* Plan was rejected by the Board because his disability "did not arise out of League football activities." *Brumm* bears directly on the former, but not at all on the latter. For this reason, knowing what *Brumm* had to say about the meaning of the phrase, "a football injury," would not be helpful to a participant, to a plan administrator, or to a court in arriving at a reasonable construction of "League football activities." *Cf. Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 726 (9th Cir. 2000) (holding that a plan administrator who knows, or should know, that a claimant may not be aware of a mandatory arbitration clause and a time limit for seeking arbitration, breaches its fiduciary duty by failing to notify the participant of required procedures).

[3] In these circumstances, we hold that the Board and Plan did not breach their fiduciary duties by failing to disclose *Brumm.*

II

A

[4] In his cross-appeal, Washington argues that the district court should have held that the settlement is invalid on the alternative ground that his release of all future benefits claims was not knowing and voluntary. To the extent his argument depends upon his not knowing about *Brumm*, we have already explained why *Brumm* was not material to classification under the new Plan. To the extent Washington maintains that his release was not knowing and voluntary because he and his attorney believed the waiver only covered claims for disabil-

ity benefits payable up to age 55 and did not extend to claims for retirement benefits, it fails as Washington expressly waived "any and all claims for disability benefits" "of every kind and nature" except for those amounts described in the agreement. Under § 5.4 of the Plan, retirement benefits are paid at the rate of whichever disability category "previously applied." Accordingly, as the district court pointed out, Washington's release of "any and all" claims for disability benefits also constituted a release of all claims for retirement benefits. That consequence is plain from the language of the settlement agreement and the Plan. The agreement further acknowledges that "[e]ach party has been represented . . . by counsel of its own choosing and each party and the party's representatives have read the Agreement and are fully aware of its contents and legal effect." Given this, no reasonable trier of fact could find that Washington's release was not knowing and voluntary.

B

[5] Washington also challenges dismissal of his request that the Plan be enjoined from requiring Washington to pay $200 for the cost of photocopying his records. However, the district court did not abuse its discretion in declining injunctive relief on the basis that the relief sought was neither ripe nor otherwise warranted.

REVERSED IN PART; AFFIRMED IN PART.

FISHER, Circuit Judge, concurring in part, dissenting in part:

I agree with the majority that the district court did not abuse its discretion in declining to award injunctive relief with respect to the Board's attempted imposition of fees. I further agree that if the Eighth Circuit's decision in *Brumm v. Bert Bell NFL Retirement Plan*, 995 F.2d 1433 (8th Cir.

1993), would have been material to a reasonable person's decision to enter into the settlement agreement at issue here, the Board had a fiduciary duty to disclose it. I disagree, however, with the majority's conclusion that *Brumm* was not material to a reasonable employee's decision-making process in this circumstance, and I therefore dissent from Part I of the majority's opinion.

We have not yet articulated the test for materiality in the context of an ERISA fiduciary's failure to disclose. *See Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1045 (9th Cir. 2001) (agreeing with district courts that facts were not material without articulating standard for materiality). I agree with the majority's suggestion, however, that the proper standard for materiality lies in analogous situations involving an ERISA fiduciary's misrepresentations. *See Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993) (concluding that a fiduciary's misrepresentation "is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if and when to retire"); *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999) (observing that "a misrepresentation is material [in the ERISA context] if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing disability benefits to which she may be entitled").

I disagree with the majority's conclusion that ignorance of *Brumm* was not substantially likely to have misled a reasonable employee in making "an adequately informed decision" whether to agree to the December 1998 settlement agreement. Actually *Brumm*'s invalidation of the criteria by which the Board had previously denied Washington's claims for football-related benefits would have been material to a reasonable employee in Washington's position in two ways.

First, knowledge of *Brumm* would likely affect a reasonable employee's decision on whether, and for how much, to

relinquish his claims under the old Plan. Even if it were evident from the new Plan's language that the Board could no longer deny Washington football-related disability benefits due to Washington's inability to trace his disability to a single injury, it would not have been evident to Washington that the Board acted arbitrarily and capriciously in doing so between 1983 and 1993. The Board notified Washington of his increased benefits under the new Plan, but did not disclose to him that the criteria it had used in its denial of his claim for football-related benefits had been held unreasonable, and that the new Plan was a response to this holding. Although the majority is correct that Washington's latest claim was for reclassification under the new Plan, the plain terms of the settlement agreement required Washington to surrender more than this most recent claim. The settlement agreement specified that it constituted "full satisfaction of any and all claims of Mr. Washington for *past and future disability benefits* under the Player Retirement Plan as in effect during the term of the 1993 collective bargaining agreement . . . or *under any plan in effect during any prior collective bargaining agreements* between the National Football League Players Association of the National Football League Management Council." (Emphasis added).[1] The majority's position that *Brumm* was

---

[1]Nor had Washington given up on claiming benefits after the 1987 arbitration. Between 1987 and 1992, Washington gathered three more medical opinions supporting his claim that his disability was related to his football injuries, and sought a settlement agreement with the Board in 1992. The Board explicitly invoked the conclusions of the 1987 arbitration in rejecting Washington's settlement proposal. At that time, the Board stated its position that it had "met its fiduciary responsibilities with regard to" Washington. There is no record that at any point between this 1992 assertion by the Board and the 1998 settlement negotiations, the Board disclosed that at least one federal appeals court had held that the Board's invocation of the Kagel criteria before 1993 was a violation of the Board's fiduciary duties. Thus, as far as we can tell from the record, Washington would not have known during settlement negotiations that the Board had reason to think that it had abrogated its fiduciary responsibilities to him or other disabled players whose claims under the old Plan the Board had denied in relying on the Kagel criteria.

not relevant because the new Plan's language mooted the Board's previous imposition of the "single football injury" requirement ignores that the settlement required Washington to relinquish any claims under the old Plan. There is a substantial likelihood that a reasonable employee who knew that the Board's reasons for denying his prior claims had been held to be arbitrary and capricious by a federal appeals court — and that in response to this decision, the employer had revamped the relevant sections of the retirement plan — would evaluate the costs of such relinquishment much differently from one who knew only that the Plan had changed.[2]

Second, knowledge that the Board could no longer rely on its previous reason for denying Washington's attempts to get football-related benefits might have increased Washington's estimated chances at ultimately securing such benefits, and thus whether and for how much to settle. The Board gave no

---

[2]I note that even if ERISA's six-year statute of limitations with respect to a fiduciary's breach of its duties, *see* 29 U.S.C. § 1113(1), barred Washington from suing the Board for some portion of the benefits to which he argued he was entitled under the old Plan, Washington undoubtedly could have pursued claims for any breach of fiduciary duty between 1992 and 1998. It is unclear what constitutes "the date of the last action which constituted a part of the [alleged] breach or violation" with respect to the use of the Kagel criteria to deny Washington football-related benefits under the old Plan. § 1113(1)(A). The final part of that breach might plausibly be placed in April 1987, when the Board first applied the Kagel criteria to deny Washington football-related benefits; in June 1992, when the Board again invoked the arbitration agreement to deny Washington's renewed request for football-related benefits; in June 1993, the last month the Board paid Washington the $750 monthly benefit under the old Plan; or in April 1996, when the Board appeared to consider the invalidated arbitration criteria in denying Washington reclassification under the new Plan. The barring effect of the statute of limitations depends on the date on which the breach is considered complete, but at least some of these dates were within six years of the December 1998 settlement agreement. Thus, the settlement agreement's clause surrendering any claims Washington might have had under the old Plan was not simply empty language, and knowing that such claims were bolstered by *Brumm* would have been material to a reasonable person relinquishing them.

new reasons for denying Washington's request for reclassification under the "Football Degenerative" category in 1993, instead simply stating that "based on the evidence before it, the Board determined that your disability did not arise out of League football activities." The Board's records from its April 18, 1996 meeting indicate that the "evidence before it" consisted of Washington's letters dated February 29, 1996 and the "Arbitration Decision dated 7/10/87." There is a substantial likelihood that a reasonable employee would estimate he had a better chance of succeeding in his appeal for Football Degenerative benefits under the new Plan, which require a showing that his disability "arises out of League football activities," if he knew that the only evidence before the Board were his letters and a decision based on invalidated criteria for determining "a football injury." After all, the Board's previous denial of Washington's request under the old Plan had explicitly relied upon the invalidated criteria, and the Board did not provide any further explanation for its conclusion that Washington's disability did not "arise out of League football activities." It is, of course, possible that the Board eschewed any reliance on the conclusions of the 1987 arbitration — and the invalidated criteria therein — that the Board had "before it" when deciding that Washington did not qualify for the higher monthly benefit even under the new Plan's broader language. However, the Board's records and communications with Washington provide no such assurance, and a reasonable employee would not necessarily have assumed such scruples on the part of his employer-cum-adversary.

I therefore conclude that there was a "substantial likelihood" that the Board's failure to disclose the invalidation of the criteria by which Washington's previous classification request had been denied would have prevented "a reasonable employee [from] making an adequately informed decision about" whether and for how much to relinquish all claims under the old Plan and to settle a claim for reclassification under the new Plan. *See Fischer*, 994 F.2d at 135. Thus, the Eighth Circuit's holding in *Brumm* was material, the Board

violated its fiduciary duties to Washington by failing to disclose it to Washington and this failure to disclose was an adequate ground upon which to rescind the settlement agreement. I would affirm the district court.